## BAUMAN *v.* GRAND TRUNK WESTERN RAILROAD COMPANY.

### DECISION OF THE COURT.

1. RAILROADS—ADEQUACY OF CROSSING PROTECTION—PLEADING—EVIDENCE.

Adequacy of crossing protection was at issue in action by trucker against railroad company for injuries sustained at grade crossing, where allegations and proofs by plaintiff showed failure on part of defendant to provide a flagman, watchman, gates, or automatic warning devices at crossing where view was partially obstructed, and neither acting engineer nor station agent gave plaintiff any warning, beyond the presence of an old crossbuck sign with reflectorized buttons.

2. SAME—ADEQUACY OF GRADE CROSSING PROTECTION—INSTRUCTIONS.

Instruction that if jury found in grade railroad crossing accident case that the area was a business or residence district, the speed limit was 25 miles per hour and there was no showing of special conditions under which the railroad would be required to furnish flashers, bells, gates, or watchmen at the crossing and no negligence could be charged to defendant for

---

REFERENCES FOR POINTS IN HEADNOTES

[1-6, 9, 11, 13, 16, 28, 29] 44 Am Jur, Railroads §§ 520–528.
Responsibility for accident at railroad crossing as affected by absence, improper location, or insufficiency of signs warning approaching travelers of presence of crossing. 93 ALR 218.
Duty to maintain safety devices at railroad crossing in addition to or in excess of statutory requirements. 71 ALR 369.
[8, 17, 23] 44 Am Jur, Railroads § 487.
[10] 44 Am Jur, Railroads § 74 *et seq.*
[12] 20 Am Jur, Evidence § 247.
[14, 18] 38 Am Jur, Negligence § 215 *et seq.*; 44 Am Jur, Railroads § 539.
[15, 27] 44 Am Jur, Railroads § 529 *et seq.*
[19] 41 Am Jur, Pleading § 81.
[20] 20 Am Jur 2d, Courts § 183 *et seq.*
[21] 30A Am Jur, Judgments § 56.
[24] 4 Am Jur 2d, Appeal and Error §§ 491, 492.
[25] 4 Am Jur 2d, Appeal and Error § 515 *et seq.*
[26] 44 Am Jur, Railroads §§ 546, 547.

failing to furnish an extra safeguard other than the regular railroad signs *held*, reversibly erroneous, where plaintiff had conceded the crossing was in a business section of town, since the trial judge effectively took from the jury its exclusive right to determine whether, in the light of all the circumstances surrounding the crossing, reasonable prudence required defendant to maintain devices warning of approaching trains in addition to the wooden crossbuck sign required by law (CLS 1956, § 466.13).

3. SAME—ADEQUACY OF GRADE CROSSING PROTECTION.

The issue of adequacy of grade crossing protection required by *common law of a railroad in addition to that required by* statute is a jury question (CLS 1956, § 466.13).

4. SAME—ADEQUACY OF GRADE CROSSING PROTECTION—PROXIMATE CAUSE.

Recovery in a railroad grade crossing accident case, based on a claim that warning devices provided were inadequate under the circumstances notwithstanding compliance with statutory requirements, is predicated on proof that is sufficient to support a jury finding that failure to provide such additional warning devices proximately caused the collision giving rise to alleged cause of action (CLS 1956, § 466.13).

5. SAME—ADEQUACY OF GRADE CROSSING PROTECTION.

The common-law duty of a railroad with respect to providing adequate protection at a grade crossing is not solely dependent upon whether the crossing is in a business or residence district or in the open country for the circumstances will vary in either a business or residence district or in open country.

6. SAME—ADEQUACY OF GRADE CROSSING PROTECTION—PROXIMATE CAUSE.

Record in trucker's action against railroad for injuries received *in accident at grade crossing held*, to show clearly that plaintiff was entitled to have issue of adequacy of protection at the grade crossing and the issue of proximate cause left to jury, the evidence supporting submission of such issues on both the dangerous crossing and subsequent negligence theories of recovery.

7. SAME—TRUCKS—SPEED—RETROGRADE AMNESIA.

The Supreme Court must assume that plaintiff trucker was not exceeding statutory 25-mile speed limit, in the absence of direct evidence as to his speed when approaching defendant's railroad track and plaintiff is suffering from retrograde amnesia, not-

withstanding there was some opinion testimony of a greater speed, obviously disbelieved by jury, making it reversible error for trial court to refuse to submit to jury issue of defendant's negligence, where its negligence was a question of fact.

8. SAME—CROSSING ACCIDENT—SUBSEQUENT NEGLIGENCE.
Submission of plaintiff's theory of subsequent negligence to jury in railroad crossing accident *held,* error.

SEPARATE OPINION.
KELLY and BLACK, JJ.

9. RAILROADS—GRADE CROSSINGS—EVIDENCE.
*The determination of whether a railroad has a special duty of motorist protective care in addition to duty or duties imposed by statute and safety regulations adopted by the public service commission must be based upon the physical circumstances disclosed by the proof, not nonphysical circumstances (CLS 1961, § 466.13).*

10. SAME—RIGHT-OF-WAY—SAFETY REGULATIONS.
*A railroad owns its right-of-way and has the right-of-way or first right of passage over its through tracks subject to promulgated safety regulations when same have been made applicable by law.*

11. SAME—GRADE CROSSING PROTECTION.
*A railroad does not have the duty to provide a flagman or an electric flasher signal not ordered by the public service commission at every rural or semirural highway crossing of main line tracks where some motorist, negligent or not, might be injured.*

12. EVIDENCE—RELEVANCY—ADMISSIBILITY—SUFFICIENCY.
*The questions of relevancy and admissibility of evidence of negligence and whether there is any evidence of negligence presented are matters for the court, not the jury; the jury's function being performed when there is evidence admitted tending to prove negligence.*

13. RAILROADS—GRADE CROSSING ACCIDENT—INSTRUCTIONS—DANGEROUS CROSSING—LAST CLEAR CHANCE.
*Instructions given in action arising from accident at railroad grade crossing, which presented trial judge's independent view of the issue as tried and his own instructed application, should certain facts be found, of the so-called "dangerous crossing" rule held, inapplicable, misleading, and reversibly erroneous for want of proof of circumstances giving rise to a jury*

question whether the crossing was of such nature that defendant had the common-law duty to provide additional warning to that required·by statute, and for want of proof that such circumstance, if shown, would be material or determinative of the issue in view of plaintiff's theory of last clear chance of defendant's engineer, to avert a collision, rendering antecedent acts noncausative and legally remote (CLS˙ 1956, § 466.13).

14. Negligence—Humanitarian Doctrine—Inattentive or Helpless Plaintiff.

The so-called humanitarian doctrine involved in negligence cases applies to permit recovery by an inattentive plaintiff as well as a helpless plaintiff.

15. Railroads — Emergency — Truck on Tracks — Contributory Negligence.

It was a question of fact for consideration by jury as to whether plaintiff whose truck had slid for some 60 feet to a stop on defendant's railroad tracks, was reversed by him, and stalled while yet partly on the track, should have stepped out to safety during the interval ensuing after the truck stopped, since plaintiff was confronted by an emergency.

16. Same—Crossing—Warning Devices—Statutes—Common Law —Instructions—Evidence.

Factual support must be presented in order that a party may be entitled to an instruction to jury that railroad company had violated its common-law duty to provide warning devices for a crossing in addition to those required by statute (CLS 1961, § 466.13).

17. Same—Subsequent Negligence—Proximate Cause—Question for Jury.

Evidence presented in action by trucker arising out of railroad grade crossing accident held, sufficient to present to jury issues of subsequent negligence of defendant's engineer and proximate cause of plaintiff's injuries.

18. Negligence—Subsequent Negligence.

The contributory negligence of the party injured will not defeat his action if it be shown that the defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of the injured party's negligence.

19. Trial—Pleading—Evidence—Theory of Case—Court Rule.

A plaintiff must allege and prove the theory of the case and a jury may not return a verdict for the plaintiff on˙ some different theory than that advanced by plaintiff, since to do so would

*subvert the court-rule requirement that the plaintiff plead the facts on which he relies and thereby inform the defendant of the nature of the cause he is called upon to defend (Court Rules Nos 17, 19 [1945]).*

20. SAME—EVIDENCE—ISSUES—PRECEDENTS.

*Evidentiary facts make and delimit rules of law and triable issues, and determine the applicability of a given precedent.*

21. COURTS—PRECEDENTS.

*The language used in an opinion of a case must be confined to the facts of that case.*

22. APPEAL AND ERROR—SUPREME COURT.

*The function of the Supreme Court is that of vigilant preservation of the right of both contenders in cases to the fair process of trial, including jury instructions that are applicable to the testimonially supported issue or issues of fact.*

23. RAILROADS—SUBSEQUENT        NEGLIGENCE—EVIDENCE—DANGEROUS
CROSSING.

*Whether the railroad company's engineer permitted the train to run down plaintiff's truck and its occupants, which was visible on the track ahead when he could and should have stopped the train in ample time and with no seeming difficulty, short of collision and injury, having been the controlling issue as presented by the proof, it was reversible error to superimpose theory of dangerous crossing in instructions when evidence supporting such theory was wanting (CLS 1961, § 466.13).*

24. APPEAL AND ERROR—FAVORABLE VIEW OF TESTIMONY.

*Favorable view of testimony does not mean an appellate court should adopt, in lieu of actual proof, matter not appearing in the forwarded testimonial record.*

25. SAME—EVIDENCE—BRIEFS.

*The sufficiency of evidence to support an instruction concerning some point of law is tested by an appellate court by direct reference to the statements and counterstatements of fact counsel make pursuant to court rules and then by corresponding reference to an analysis of the testimonial record and not by polemics counsel advance in portions of their briefs devoted to argument.*

26. RAILROADS—AUTOMOBILES—SPEED—OBSERVATION—OBSTRUCTIONS.

*A motorist who approaches a main line grade crossing of a railroad has a duty to slow his speed so as to be able to look both ways and take such safe preventive measures as observations may indicate and from a safe position where the view is wholly*

unobstructed there is ample time and distance to stop short of
the tracks.

27. Same — Automobiles — Obstructions — Observations — Con-
tributory Negligence.

A motorist who proves only that he looked in the direction of
ultimate danger when his view of the railroad tracks was ob-
structed, and saw no train, and then proves that, without inter-
vening decrease of speed, he did not look again in such direction
until his car was so close to the track that an application of its
brakes resulted in its sliding up to and on the tracks does not
make out a case for consideration of the jury on the issue of
contributory negligence.

28. Same—Grade  Crossing—Protection—Dangerous  Crossing—
Instruction.

Record in action arising from grade crossing accident held, to
present no evidence of obstruction of view sufficient to make
a so-called dangerous crossing case and to entitle plaintiff to
instruction to such effect either because of obstructions and
lack of warning by bell, sign, or flagman, or because train
involved was not running on a scheduled time, frequency of
use by many people, including school children of kindergarten
age, lack of noise by silent diesel engines, or because engine
was being operated by an inexperienced acting engineer.

Separate Opinion.

O'Hara, J.

29. Same—Additional Crossing Protection.

Plaintiff trucker, injured in railway grade crossing accident, held,
to have not sustained burden of proof that physical circum-
stances existing at the grade crossing involved gave rise to any
additional duty on the part of the railroad to provide crossing
protection in addition to that required by statute or order of
the public service commission.

See headnote 2.

Appeal from Jackson; Dalton (John C.), J.  Sub-
mitted November 5, 1964.  (Calendar No. 56, Docket
No. 50,367.)  Decided December 7, 1965.  Rehearing
denied January 5, 1966.

Declaration by James A. Bauman against Grand
Trunk Western Railroad, a Michigan corporation,
for injuries allegedly incurred when a truck driven
by plaintiff was struck by one of defendant's trains

at a grade crossing.   Verdict and judgment for
defendant.   Plaintiff appeals.   Reversed and re-
manded.

*Kelly, Kelly & Kelly* (*Phillip C. Kelly,* of counsel),
for plaintiff.

*McKone, Badgley, Domke & Kline* (*Maxwell F.
Badgley,* of counsel), for defendant.

SMITH, J.   This time in this case, the chief question
for review concerns jury instructions.   Other facets
of the case are contained in 2 prior reports.[1]   Essen-
tially, the facts are that a collision occurred in the
early afternoon of April 20, 1956, at a grade crossing
in the village of Gregory, between one of defendant's
trains and a truck driven by plaintiff.   At the point
where the accident happened, defendant's single
track crosses highway M 36 almost at right angles.
The crossing was marked by a crossbuck sign which
was reflectorized, but without warning lights or other
crossing protection.   Plaintiff's counsel conceded in
his opening statement that the crossing is in the
business section of the village and, for a distance of
more than 300 feet north of the tracks, the frontage
on M 36 (Main street in Gregory) is occupied by
dwellings and buildings.
   One of plaintiff's pleaded claims was that defend-
ant was negligent in failing to provide more adequate
crossing protection such as lights, gates, and a warn-
ing bell, and as a result thereof plaintiff was not
warned of the approaching train in sufficient time
to avoid collision with it.   Among the proofs were

[1] Twice before this case has come before the Court for review.   In
the first instance, we ruled on a venue question.   *Bauman* v. *Grand
Trunk W. R. Co.,* 353 Mich 279.   In the second instance, this Court
found that the trial court abused its discretion in refusing a con-
tinuance motion where the principal attorney became seriously ill
during trial.   *Bauman* v. *Grand Trunk W. R. Co.,* 363 Mich 604.

the following: obstructions to plaintiff's view of any oncoming trains occasioned by buildings and other objects abutting the highway and the railroad right-of-way; trains making the crossing at various times not according to any particular schedule; relative silence of diesel engines as compared with steam locomotives formerly in use, and other proofs. Defendant offered counter proofs, so it is clear that the adequacy of crossing protection was in issue. (See direct quotation from plaintiff's brief.)[2]

---

[2] "2. Where the declaration alleged that defendant was negligent in failing to provide more adequate safeguards at the crossing, was it proper to instruct the jury that no negligence could be charged to defendant for such failure if the crossing was in a business or residence district?

"Plaintiff's declaration alleged:

" 'That the negligence and unlawful conduct of the defendant, consisted of the following: * * *

" '(c) Failing to provide a flagman or watchman to warn and apprise plaintiff that he was approaching a railroad crossing at the time the train of the defendant was approaching said highway and railroad crossing;

" '(d) In failing to provide or operate a protective gate or gates, across said highway at said railroad crossing;

" '(e) In failing to provide and furnish an automatic electric bell or other warning or signal device at said railroad crossing to warn and apprise the plaintiff of the approach of any train of cars of said defendant to said crossing on said railroad' (19a–20a).

"There was evidence before the jury of all of the following facts:

"(a) Obstruction to plaintiff's view in approaching the crossing (Exhibits 1, 2, 3, 4 and 5, pp 2a–6a, 52a–54a).

"(b) The train running on no scheduled time (304a).

"(c) An average of 600 motor vehicles on a State trunkline highway passing over this crossing daily (104a), contrasted with conditions at the crossing some 40 years earlier showing horsedrawn vehicles and only an occasional automobile over a dirt road, with the same crossbuck sign then in place, the only change being reflectorized letters thereon (Exhibit 11, pp 240a–244a).

"(d) The old noisy steam locomotive (Exhibit 11) replaced by the comparatively silent diesel engine.

"(e) School children, including those of kindergarten age, passing over the crossing several times daily (pp 111a, 112a).

"(f) Operation of the engine at the time of the accident by an inexperienced acting engineer (pp 290a–303a).

"(g) Failure of the acting engineer to sound the bell or whistle of the engine as it approached the crossing (pp 52a–57a, 95a–100a).

"(h) Failure to have the station agent, standing nearby, give plaintiff any warning signal of the approaching train (482a).

"Whether or not these combined conditions and circumstances would require defendant, in the exercise of reasonable care, to provide some signal beyond the old crossbuck sign, to warn motorists of the ap-

As to the same issue, plaintiff requested an in-
struction that the presence of a crossbuck warning
sign would not relieve the railroad of its duty to
furnish other protection if special conditions re-
quired, citing and relying upon *McParlan* v. *Grand
Trunk W. R. Co.,* 273 Mich 527.

The following charge was given:

"Now, in regard to this question of special condi-
tions, *if you find,* and by a preponderance of the evi-
dence, *that the area* of highway M 36 north from the
crossing in question here *was a business or residence
district* as I have defined it for you, *then the speed
limit there would be 25 miles per hour and there
would not have been shown special conditions in this
case under which the railroad would be required to
furnish flashers, bells, gates, or watchmen* at this
crossing, and no negligence could be charged to the
railroad for failing to furnish any extra safeguard
other than the regular railroad signs; and in this
case it is not disputed that the regular railroad sign
was furnished.

"Now, on the other hand, jurors, *if you find by a
preponderance of the evidence that the area* of high-
way M 36 north from the crossing in question here
*was not a business or residential district; then this
question is presented* for your consideration; and in
that connection I instruct you as follows:

"As to the lack of adequate signs, signals, gates
or flagman at the crossing, I instruct you that the
presence of the crossarm sign does not relieve the
railroad company from the necessity of furnishing
further safeguards if there are special circumstances
which would reasonably require them." (Emphasis
supplied.)

In the light of the concession made by plaintiff's
counsel in his opening statement that the crossing

_____

proaching train, was a question for the jury. But the trial court told
the jury that they could not consider this issue at all if the crossing
was in a business or residence district."

was located in the business section of Gregory and in the absence of any evidentiary conflict with reference thereto during the trial, there was no occasion to submit to the jury, as the trial judge did, the question whether the crossing was or was not within a business, residential or other area. Furthermore, by his quoted instruction the trial judge effectively took from the jury its exclusive right to determine whether, in light of all the facts and circumstances surrounding this business district grade crossing, reasonable prudence required the railroad to maintain devices warning motorists of its approaching trains in addition to the wooden crossbuck sign required by law[3] and present at the crossing. This error, fatally affecting one of the key issues pleaded by plaintiff and supported by his proofs, requires reversal and remand for new trial.

Since the trial of this case of Bauman and about one year after denial of plaintiff's motion for new trial, this Court reviewed comprehensively the common-law duty of railroads to maintain grade crossing protective devices in addition to those required by statute, in *Emery* v. *Chesapeake & O. R. Co.* (1964), 372 Mich 663. In the *Emery Case,* plaintiff, at night, drove his automobile into the side of a train, striking the 31st and 32d cars of a 56-car train. The only warning device at this single-track grade crossing was a standard wooden crossbuck sign. The crossing is in the city of Flint. This Court held that (p 681) "the trial judge properly submitted for jury determination the question whether the physical circumstances existing at the grade crossing involved in this case required defendant railroad in the exercise of ordinary care and prudence commensurate with such circumstances to

3 See CLS 1956, § 466.13 (Stat Ann 1957 Cum Supp § 22.272).— REPORTER.

provide warning devices in addition to the ordinary wooden crossbuck sign."[4]

In *Emery,* we admonished bench and bar that the common-law duty of railroads to use "ordinary care and prudence commensurate with *all* the circumstances" should be applied without encumbrance by "the analysis-crippling semantics of 'special conditions' ", or "unusual conditions" or "special circumstances." By analysis of the following cases, it was demonstrated that beginning with early Michigan decisions, the rule has been most often applied in its broad perspective, without the "analysis-crippling semantics." *Staal* v. *Grand Rapids & I. R. Co.,* 57 Mich 239; *Guggenheim* v. *Lake Shore & M. S. R. Co.,* 66 Mich 150; *Freeman* v. *Duluth S. S. & A. R. Co.,* 74 Mich 86 (3 LRA 594); and *Barnum* v. *Grand Trunk W. R. Co.,* 148 Mich 370. It was also held in the *Emery Case,* that although the rule had been accurately stated in *McParlan* v. *Grand Trunk W. R. Co., supra,* in that case, however, the rule was improperly applied.

The Court further held in *Emery* that the "trial judge erred in his conclusion, in granting defendant's motion for judgment *non obstante veredicto,* that absent proof of 'unusual conditions' at this crossing, as a matter of law defendant was under no obligation to maintain additional warning devices." The Court said at page 680:

"*McParlan, Staal, Guggenheim, Freeman,* and *Barnum* should no longer be misconstrued as the sources of a truly exceptional and equally erroneous rule (nor should those cases be misapplied to reach a result) by which railroads are relieved of their common-law obligation to maintain such grade crossing safeguards as ordinary prudence requires upon judicial determination of the absence of 'special cir-

---

[4] The trial judge was reversed for granting defendant's motion for judgment *non obstante veredicto.*

cumstances.' The decisions discussed above were
true to the common law in recognizing that responsi-
bility for determination of that which ordinary
prudence requires is placed squarely and exclusively
in our system of justice upon the jury and it is not
a responsibility subject to a judge's determination
of the presence of a factual condition precedent.
Only in *McParlan* did the Court fail to apply that
rule, while at the same time acknowledging its exist-
ence."

Not to be overlooked in our *Emery* opinion is its
second part, p 681 *et seq.,* in which, by reference to
*Walsh* v. *Grand Trunk W. R. Co.* (1961), 363 Mich
522, we considered the adequacy of Emery's proof
linking defendant railroad's breach of its common-
law duty and Emery's injuries by the chain of proxi-
mate causation. In that case, we found legally suf-
ficient evidentiary support for the inference of
causation the jury necessarily drew in rendering its
verdict for *Emery*. In *Walsh,* on the other hand,
as in *Baldinger* v. *Ann Arbor R. Co.* (1964),
372 Mich 685, decided with *Emery,* we found
the plaintiffs' proofs of causation legally insufficient.
As in every other assertion of actionable common-
law negligence, before a highway traveler injured
by collision with a train at a grade crossing is en-
titled to have submitted to a jury his claim that the
physical circumstances existing at the grade crossing
required the railroad in the exercise of ordinary
care and prudence commensurate with such circum-
stances to provide warning devices in addition to
those required by statute and actually maintained
by the railroad, he must offer proof legally suffi-
cient to support a jury finding that failure to pro-
vide such additional warning devices proximately
caused the collision. It is not enough to prove even
the most blatant disregard by a railroad of its
common-law duty if the evidence shows such breach

of duty had nothing whatever to do with plaintiff's
damage or if the evidence offers no more than a
conjectural choice as to proximate cause, as in *Walsh,
supra.*

We believe the proofs offered by plaintiff, de-
scribed below, were legally sufficient to have sup-
ported a jury finding that defendant's alleged breach
of duty proximately caused the collision.  We con-
clude that the jury instruction quoted above was re-
versibly erroneous because it pre-empted the jury's
exclusive right to determine what additional warning
devices, if any, the physical circumstances of the
grade crossing required of defendant to satisfy its
common-law duty of due care.

We know of no case where the common-law duty
of railroads as to crossing protection is, as a matter
of law, solely dependent upon whether the crossing
is in a business or residence district or in the open
country.   Certainly, facts and circumstances will
vary between crossings in a business or residence
district as they will vary in the open country.  Thus,
unless no reasonable minds can disagree, it remains
a jury question, in view of all the facts and circum-
stances, whether crossing protection, in addition to
that provided by statute, is reasonably required.
The quest remains constant.   Thus while we found
in *Baldinger, supra,* that plaintiff's view was not
so obstructed that she could not see defendant's
train approaching an open country crossing, we
drew no distinction between an unobstructed cross-
ing in open country and an unobstructed crossing
in a city, nor was a distinction otherwise drawn be-
tween country and city crossings in *Emery,* a city
crossing case.   Neither in *Barnum, supra,* a city
crossing case, nor in any other of the principal cases
cited, is there any suggestion that the variable
common-law duty, which depends upon all relevant
factual circumstances, is altered one whit merely

by the fact that the crossing is in a residence or business district or in open country. There being no support for it in either reason or authority, we are constrained to hold that the charge as given constituted reversible error.

Before discussing the proximate cause issue, one other point should be made about the instruction. The trial judge's opinion denying plaintiff's motion for new trial does not state why he pre-empted this determination from the jury, if it found from the evidence, as it would have had to do, that the crossing was in a business or residential section while permitting the jury to determine whether or not the crossing was in such section.[5]

As we have noted, the record discloses proofs which clearly entitled plaintiff to submission to the jury of the issue of the railroad's alleged breach of its common-law duty to provide adequate warning devices at its grade crossing and that such breach of duty proximately caused the collision. We do not agree with Justice BLACK's conclusion that plaintiff's causation proofs support only his subsequent negligence theory of recovery and that they do not support a theory based upon the "dangerous crossing" rule. As we view that evidence, it supports both theories on the issue of causation.

Plaintiff, suffering retrograde amnesia, was unable to testify regarding events immediately preceding the collision, but other witnesses testified fully, if contradictorily. Viewing such testimony

---

[5] It was suggested during oral argument before this Court, and we are inclined to agree, that the trial judge probably reasoned that if the collision occurred in a business or residential section where State law (CLS 1956, § 257.627 [Stat Ann 1952 Rev § 9.2327]) imposes a 25-mile speed limit, the plaintiff would have had sufficient time to stop had he been traveling within the speed limit even after he had passed beyond the obstructions to his view along the tracks and, thus, that as a matter of law he was not entitled to a verdict based upon this claim of common-law negligence. If this were the judge's reasoning, the factual record does not permit such a conclusion as a matter of law. See our discussion of that factual record, *infra*.

and other evidence in the light most favorable to plaintiff, we must conclude that plaintiff's southeastward view of defendant's westbound 10-car train, traveling at 30 miles per hour as he approached the grade crossing, was blocked by a two-story building located, at its nearest point to the intersecting highway and track, 35 feet from the center line of the 20-foot highway and 62 feet from the northernmost track. The intersection of the highway and track, in its northeast quadrant, was at an angle of 93°25'. Thus, when plaintiff was 100 feet from the track, his vision eastward along the track was blocked beyond 96 feet from the intersection by the building described. At 90 feet from the track, he had a view of only 142 feet eastward from the intersection. At 75 feet, his view extended 219 feet. Other obstructions, along the roadway and, as well, along the track, substantially, if not completely, blocked plaintiff's view of westbound rail traffic before he arrived at a point 100 feet from the grade crossing. There were, likewise, obstructions to plaintiff's westward view as he approached the grade crossing.

Absent any direct evidence of plaintiff's speed,[6] we must assume for our purposes on this appeal, that he was not exceeding the statutory 25-mile speed limit. The evidence indicated that at that speed,

---

[6] There was evidence that skid marks leading up to the track, 60 feet in length, indicated plaintiff's speed was 33 miles per hour. However, the evidence was such that the jury could have concluded that the skid marks were not made by plaintiff's truck. Furthermore, the estimate of speed from the length of the skid marks did not take into account which tires, front or rear, commenced the skid marks, nor in determining perception reaction time did the witness who made the estimates of speed consider that plaintiff's position in the truck cab was some undisclosed distance from the front wheels of the truck. Thus, absent evidence of the truck's wheelbase and the distance from plaintiff's position in the cab to the front of the truck, both crucial to an accurate estimate of plaintiff's speed, the jury would have been entitled for those additional reasons, although we do not suggest by saying this that a jury cannot disbelieve opinion evidence even in the absence of apparent reason, to disregard the opinion testimony of plaintiff's speed.

plaintiff was traveling 37 feet per second. Thus, while less than three seconds away from the crossing 100 feet distant, plaintiff's eastward view of defendant's track was obstructed as was the corresponding northward view of the train crew. Within this all-too-brief span of time plaintiff, and indeed any other traveler approaching the crossing within the speed limit, had to look not only eastward, but westward as well, which the record indicates plaintiff did after he had passed a point 75 feet from the crossing. Even were the jury to assume that an average motorist traveling in a vehicle at 25 miles per hour on dry asphalt could, theoretically, stop the vehicle in 67 feet, as the jury was advised by a documentary exhibit introduced in evidence, it would have been entitled to find, entirely consistent with plaintiff's alternative theory of subsequent negligence, that plaintiff's first perception of defendant's westbound train occurred so near the crossing, that he applied his brakes in panic, skidded onto the railroad track and stalled his engine in a frantic effort to back away from the onrushing train. The jury would have been entitled to find, if properly instructed, that the physical circumstances existing at the grade crossing "required defendant railroad in the exercise of ordinary care and prudence commensurate with such circumstances to provide warning devices in addition to the ordinary wooden crossbuck sign" (*Emery, supra,* p 681) and that the absence of such additional warning devices caused plaintiff to react as he did, upon sudden perception of the unexpected train, in his futile effort to avoid collision. Consequently, we hold it was reversible error for the trial judge to refuse to submit to the jury the issue of defendant's common-law duty to furnish warning devices in addition to those required by statute.

We agree with Justice BLACK, and for the reasons he has stated, that the trial judge's jury submission of plaintiff's subsequent negligence theory was likewise erroneous.

Reversed and remanded for new trial. Costs to plaintiff.

T. M. KAVANAGH, C. J., and DETHMERS, SOURIS, and ADAMS, JJ., concurred with SMITH, J.

BLACK, J. (*concurring in reversal*). This case has been tried twice. The first trial commenced February 18, 1959. It ended April 22, 1959, with a verdict in favor of plaintiff. See *Bauman* v. *Grand Trunk W. R. Co.*, 363 Mich 604, reversing judgment entered upon such verdict. The second trial commenced June 5, 1962, and ended June 29, 1962, with a verdict in favor of defendant. Judgment having entered upon that verdict, plaintiff has brought the present appeal. As against such litigatory background we had best see that our order for a third trial goes down in company with such clear words of guidance, fitted specifically to the evidence-defined issue of *causation,* as will most likely insure finality of whatever third verdict a third jury will report.

Our forthcoming decision involves far more than that which meets the immediate gaze. The legal duties and legal rights of the present plaintiff and defendant, arising from this particular collision at grade on April 20, 1956, pale in array with the bold portents of Justice SMITH's instant proposal of precedent for all like grade crossing actions that are not yet barred by limitational statute; referring to suits where the plaintiff decides to theorize that certain nonphysical circumstances he has selected with care, out of all of the physical and nonphysical circumstances disclosed by the proof, were of such nature as to burden the defendant railroad with a

special duty of motorist-protective care; a duty imposed over and above such duty or duties as were required by statute and safety regulations adopted by the public service commission.

My Brother's candid proposal is that, with or without extraordinary proof such as *was* shown in the *Emery Case* (*Emery* v. *Chesapeake & O. R. Co.*, 372 Mich 663) and was *not* shown in the *Baldinger Case* (*Baldinger* v. *Ann Arbor R. Co.*, 372 Mich 685),[1] the plaintiff in a case as now here may assemble selected proof of such nonphysical circumstances and then, citing the *Emery Case*, call it proof supportive of submission to the jury of question whether the defendant railroad was duty-bound to provide some additional "local warning."

There can be no blinking of these portents. Today, many if not most manifest or through freight trains, powered as they are by multiple diesel-electric locomotives, consist regularly of 100 and more cars. These trains usually are a mile or more long; long enough to seriously block—at one time—two or more mile-apart or half-mile apart highway crossings if such trains are not moved at reasonably continuous speed. The total tonnage of these trains, whether the cars are fully or partially loaded, is understandably stupendous. Other freight trains, less lengthy and weighty and running through or running locally, are regularly slowable and stoppable only in lesser degree.

And one established rule of law should never be forgotten as this discourse proceeds. It is that the railroad actually owns its right-of-way (*Kelly* v.

---

[1] The two cases were studied together, conferred upon together, signed together, and handed down together on May 4, 1964. With exception of Justice Kelly, both opinions were indorsed unanimously by all presently seated Justices. We should look at both—together—when called upon to determine whether the proof in a given grade crossing case is sufficient to justify submission to jury of that rule of legal *duty* (not causation) the reader finds uniformly expounded in the two cases.

*Michigan C. R. Co.,* 65 Mich 186; followed in *Fish
v. G. T. W. R. Co.,* 275 Mich 273 and 275 Mich 718),
and must, of understood necessity, have the right-of-
way or first right of passage over its "high iron"
crossings (distinguished from crossings of spur,
loading, or other nonthrough tracks), subject always
to promulgated safety regulations when same have
been made applicable by law.

To impose upon Michigan railroads, on pain of
what is presently proposed, a legal duty (a) to pro-
vide a flagman at every rural or semirural highway
crossing of main line tracks where some negligent
or nonnegligent motorist might be injured in circum-
stances such as are shown in this Bauman Case; or
(b) a duty to install for each such crossing electric
flasher signals which the public service commission
has *not* ordered for that crossing pursuant to its
statutory authority, or, in lieu of such alternatives
and on like pain, to burden such railroads with duty
to slow each train, to an insurer's slow rate of speed
before entering it upon each such highway crossing,
"must effectually put an end to all railroads, as a
means of speedy travel or transportation."[2]  I am
sure also that any such imposition would generate
lusty cheers in the halls of the Teamsters Union
along with powerful political support for such Jus-
tices as might vote thus thoughtlessly to cripple
railroad freight competition in favor of more and
more transportation of heavy freight on our high-
ways.

This question of sufficiency of the evidence prof-
fered by like burden-bearers is not new.  The right
approach to it was stated in the early grade cross-
ing case of *Lakeshore & M. S. R. Co.* v. *Miller,* 25
Mich 274, 294:

---

[2] The quotation is from *Lake Shore & M. S. R. Co.* v. *Miller,* 25
Mich 274, 280.

"Juries may act upon the question of diligence when there is any evidence tending to prove it. If there be no such evidence, there is nothing before them upon which they can find such diligence. And the question of the relevancy of evidence and its tendency to prove diligence, or whether there be any such evidence, is not a question for the jury, but a question of law for the court; and it must be decided by the court, and not by the jury. If the question of diligence or negligence were *exclusively* one of fact for the jury, without reference to any legal principle applicable to it, then it would necessarily follow that the jury, and not the court, must determine the relevancy and admissibility of all evidence offered for the purpose of proving the one or the other." (Emphasis by Justice Christiancy.)

The jury instructions quoted in Justice Smith's opinion were not given on request of any counsel. I concede—for reasons to be specified—that they were inapplicable, misleading, and reversibly erroneous. They exhibit Judge Dalton's independent view of the issue as tried and his own instructed application, should certain facts be found, of the so-called "dangerous crossing" rule; a rule which never entered the case (a) for want of such proof as might give rise to a jury question whether the *"physical* circumstances at the grade crossing" were of such nature that due or ordinary care required, of the defendant railroad, that it provide "some efficient local warning" over and above the requirements of statutory law[3] and safety regulations promulgated thereunder,[4] and (b) for want of proof that any such "physical circumstances," even if shown (which

---

[3] CLS 1956, § 466.13 (Stat Ann 1957 Cum Supp § 22.272).—Reporter.

[4] The quotations are taken from a summary paragraph of our opinion of *Emery* v. *C. & O. R. Co.*, 372 Mich 663, 680, 681, referring to that portion which deals with the pivotal question of sufficiency of proof of *duty;* not *causation.* Of such question of duty, and of present sufficiency of proof thereof, more later.

I deny emphatically), would be instructionally material or determinative in view of plaintiff's undeviating theory that the engineer's "last clear chance" rendered all antecedent acts and omissions, whether negligent or not and whether attributable to plaintiff or defendant, noncausative and therefore legally remote. I shall come, presently, to the precise details of the proof plaintiff offered in support of his said theory.

In my view the trial judge's jury instructions should, on retrial, be confined to question whether the railroad was causally negligent and to question whether plaintiff's seemingly manifest negligence was antecedent, and therefore noncontributory, in that he was run down in violation of the so-called humanitarian doctrine. For an up to date analysis of that doctrine, see 2 Restatement (Second), Torts §§ 479, 480, pp 530–536, and comment thereunder. And for Michigan's well understood and consistently declared view thereof, applicable directly to railroad grade crossing cases, I suggest review of *LaBarge* v. *Pere Marquette R. Co.,* 134 Mich 139, 141–147 and *Fike* v. *Pere Marquette R. Co.,* 174 Mich 167, 204–208.

The doctrine applies, as said sections 479 and 480 make plain, to an "inattentive plaintiff" as well as to a "helpless plaintiff." Moreover, the question whether this plaintiff, during the interval which ensued when his pickup truck slid to a stop on the tracks, remained there from 6 to 8 seconds, then was reversed by him, and then was stalled by him before it cleared the path of the train, should have stepped out to safety, was a question of fact. See *Fike* v. *Pere Marquette R. Co., supra,* and *Citizens' Mutual Automobile Insurance Co.* v. *City of Detroit,* 348 Mich 329. As regards such time-interval the *Fike* and *Citizens' Mutual Cases* presented jury issues

duplicating what this plaintiff's proofs disclose. To quote from the *Citizens' Mutual Case* (pp 333, 334):

"Viewed retrospectively it could appear to plaintiff that it would have been better had she attempted to save herself by quitting the automobile before the collision, but that does not determine the question when one is confronted with coming to a quick decision in an emergency. Whether it was reasonable to remain in the automobile or abandon it under the circumstances presents a question of fact and not one of law."

I cannot sign the opinion Justice Smith has proposed. Written for a case which presents an exclusively supported case for recovery on the theory of subsequent negligence, it applies factually inapplicable *Emery,* a case which presented no question of last clear chance, of the defendant railroad, to prevent Emerson Emery's driving in the nighttime into the 31st or 32d car of the railroad's passing train. It ignores what was held specifically on the same day of *Emery's* release (in *Baldinger* v. *Ann Arbor R. Co.,* 372 Mich 685), that is, the plaintiff must, if he desires jury instruction and jury consideration of the "dangerous crossing" rule,[5] adduce proof (some proof as Mr. Emery indubitably did and Mr. Baldinger just as surely did not) of those "physical circumstances existing at the grade crossing" which "required defendant railroad in the exer-

[5] The rule, written in *McParlan* v. *Grand Trunk W. R. Co.,* 273 Mich 527, 533 and approved in *Emery* at 673 and in *Baldinger* at 688–690, appears in *McParlan* as follows:

"The fact that defendant maintained the safeguards and signals required by statute, or order thereunder, did not relieve it of the common-law duty to maintain such other protection to travelers on the highway as ordinary care and prudence demanded. The statutory safeguards are not exclusive but, under special conditions, it would be the duty of the railroad company to maintain others. *Staal* v. *Grand Rapids & I. R. Co.,* 57 Mich 239; *Guggenheim* v. *Lake Shore & M. S. R. Co.,* 66 Mich 150; *Freeman* v. *Duluth, S.S. & A. R. Co.,* 74 Mich 86 (3 LRA 594); *Barnum* v. *Grand Trunk W. R. Co.,* 148 Mich 370."

cise of ordinary care and prudence commensurate with such circumstances to provide warning devices in addition to the ordinary wooden crossbuck sign." And it—the proposed opinion—avoids the legal effect of plaintiff's exclusively triable theory of recovery if, as we must assume for the purposes of his present appeal, this unfortunate collision occurred in the manner related by his sole witness of precise fact and causation, Harry Cartmell.[6]

It is best that evidentiary facts, rather than disputatious writing, speak from this point. There can be no dispute over the key testimony of Mr. Cartmell provided such testimony is related in the exact words of plaintiff's counsel. The following has therefore been taken from plaintiff's brief-presented statement of facts (not from the "Argument" portion of such brief):

"Harry Cartmell, plaintiff's helper, after relating the incidents of the day up to their lunch time, picked up the story from that point:

"He testified that they proceeded easterly on Dexter Trail to where it intersects State trunkline highway M 36, which then leads southerly into the village of Gregory. They traveled south on this road and Cartmell observed the crossbuck sign at the railroad crossing, he listened, his hearing was good, but he heard no whistle or bell of a train. The wind was blowing from the north. The view from the truck was obstructed by buildings at either side of the highway (Exhibits 1 through 6) and, as he approached the crossing, he continued to listen but heard no sound of bell or whistle, he looked to his right and his left, his view being obstructed as shown, and, as the truck proceeded to the south side of the two-story frame and block building at the east side of the highway and nearest the railroad

---

6 It was shown that plaintiff, since the time of the collision, has been unable to testify to any of the causal facts. As to such it is said that he suffers from retrograde amnesia.

crossing, his view extended to the elevator which was immediately south of the railroad tracks, the east end of which was 405 feet east of the center of the highway. At this point, he looked and saw no train within that distance nor did he hear any bell or whistle of a train. He then looked to his right, until the truck cleared the billboard at the right side of the highway (Exhibit 6) and saw no train coming from that direction. He then looked again to the left, or east, and then saw the engine for the first time at the east end of the elevator. Plaintiff saw it at the same time and they both exclaimed. Plaintiff applied the brakes and the truck skidded onto the tracks and stopped with the cab of the truck in the center of the tracks. The witness looked down the tracks at the approaching train but still heard no bell or whistle from it and, as he watched it, saw no reduction in its speed. Plaintiff put the truck into reverse gear and backed off and had cleared the tracks, except for the front of the truck, when the motor stalled. The train came on, caught the left front of the truck with the right front of the engine, spun it around, the left door of the truck flew open and plaintiff fell out and under the wheels of the engine, which severed both of his legs, one at the knee and the other just below the knee. Cartmell's foot caught in the gear shift levers as he was thrown about in the truck, and he did not fall out. The train, some 450 to 500 feet in length, continued on until the rear end was at the depot, 111 feet west of the center of the highway."

This portrays the plaintiff's only proof-supported theory of recovery. For jury-instructional purposes it is that defendant's train approached the crossing at a moderate rate of speed;[7] that the train was comparatively short and light (10 cars, about half loaded); that the engineer failed to sound the whistle

[7] The parties agreed, during the trial, that the train approached the crossing at the approximate rate of 30 miles per hour.

or bell of the locomotive at any time; that the engineer could have stopped the train in less than half the distance between the crossing and the point where, the oncoming locomotive then being at plaintiff's left opposite or just beyond the east end of the grain elevator (see photographic exhibit G, *post*), plaintiff without any question had a continuously unobstructed view of the train and the engineer without any question had a similarly unobstructed view of plaintiff's pickup truck; that he, the engineer, was able and under duty to observe the pickup truck as it slid (60 feet according to measured skidmarks leading to the first rail) onto the tracks where it stopped; that he, the engineer, was able and under duty to observe what plaintiff and Mr. Cartmell did and did not do thereafter, and that he, the engineer, nevertheless was so inattentive and hence so negligent as to continue on without slackening of the speed of the train, thus running down the truck and its occupants and failing to stop the train until the *entire length* thereof had passed over the highway crossing and beyond to a point 111 feet west of the center of the highway. Plaintiff's expert witness, a retired railroad engineer, supported such theory by testifying that the train, approaching the crossing at the above-agreed rate of speed, could have been stopped in "150 to 175 feet."

Now for even more exact details as related by the witness Cartmell. He testified that plaintiff's pickup truck "began to slide or skid toward the crossing" when both occupants of the truck discovered—simultaneously—the approach of the train and plaintiff applied the brakes of the truck. He testified that, after plaintiff's truck slid on the tracks and stopped there, plaintiff shifted into reverse and "backed it up some," whereupon the motor of the truck stalled. His testimony proceeded:

*(Direct Examination)*

"*Q.* How far had he gotten back off the tracks to the north before he killed the motor?

"*A.* I would say about 18 inches of the truck. Approximately 18 inches of the truck was by the tracks.

"*Q.* Which end of the truck?

"*A.* The front end. Front end of the truck.

"*Q.* Is that the point at which the motor stalled?

"*A.* Yes, sir.

"*Q.* The front end about 18 inches?

"*A.* That's correct.

"*Q.* In the path of the train?

"*A.* That's right.

"*Q.* As you sat in the truck watching that train come down on you, will you state whether or not you observed any reduction in the speed of that train before it struck you?

"*A.* I did not.

*(Cross Examination)*

"*Q.* Where was the train with reference to that building, then, when you stopped?

"*A.* Right at the far end of the building.

"*Q.* At the far end?

"*A.* That is right.

"*Q.* That would be the east end of that building on which the cupola is located?

"*A.* That is correct.

"*Q.* And then Mr. Bauman, you say, put the car in reverse?

"*A.* That is correct.

"*Q.* How long was it that you sat there with the car crossways of the track, or across the track, looking down the track, before Mr. Bauman reversed the automobile?

"*A.* I would say 6 to 8 seconds.

"*Q.* And then he got it in reverse, is that it?

"*A.* That is correct.

"*Q.* You backed up. Is that what you said?

"*A.* That is correct.

"*Q.* Until there was only 18 inches of the front of the truck on the track.

"*A.* That is right.

"*Q.* When you say 'on the track,' I understand you to mean from the north rail into the space between the tracks.

"*A.* Coming to it."

Now that theory of negligence and causation, supported as it was by the quoted and identified proof, provides legal right to jury determination thereof no matter what a judge or judges might do later on motion addressed to the clear weight of all of the proofs (*Woodin* v. *Durfee,* 46 Mich 424). See to the legal point *LaBarge* and *Fike, supra;* also the grade crossing cases of *Grand Trunk R. Co.* v. *Ives,* 144 US 408, 429, 430 (12 S Ct 679, 36 L ed 484)[8] and *Dunn* v. *City of Detroit,* 349 Mich 228. Submitted to a duly instructed jury, such theory and proof would authorize a verdict that the proximate and therefore sole cause of plaintiff's injuries was culpably continuant failure of due lookout to the fore, by defendant's engineer, and consequent omission of what otherwise easily could and therefore should have been done by him, that is, brake and stop the train well short of the highway crossing ahead.

Such a verdict would amount to a finding of actionable negligence on the part of the railroad no matter what antecedent and therefore remote cause or causes led plaintiff to drive toward and on the

[8] "Although the defendant's negligence may have been the primary cause of the injury complained of, yet an action for such injury cannot be maintained if the proximate and immediate cause of the injury can be traced to the want of ordinary care and caution in the person injured; subject to this qualification, which has grown up in recent years (having been first enunciated in *Davies* v. *Mann,* 10 M & W 546 [152 Eng Rep 588]), that the contributory negligence of the party injured will not defeat the action if it be shown that the defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of the injured party's negligence." (*Ives Case* at 429.)

tracks as he did and then do or omit to do what Mr. Cartmell's testimony shows as the train continued to bear down on the crossing without reduction of speed. Indeed, such was the only theory upon which plaintiff could and yet may recover, it being the only one he as burden-bearer has been able to support with proof. As written in *Scott* v. *Cleveland,* 360 Mich 322, 331 (quoting and following *Hormel Estate* v. *Harris,* 348 Mich 201, 205) :[9]

"Plaintiff must allege and prove its theory of the case, the claimed negligent acts of defendants and the manner in which it claims that the accident occurred. The jury may not return a verdict for plaintiff on some different theory than that advanced by plaintiff. Otherwise the purpose of requiring a plaintiff to plead the facts on which he relies (Court Rule No 17 [1945]) and set forth in his declaration such specific allegations as will reasonably inform the defendant of the nature of the cause he is called upon to defend (Court Rule No 19 [1945]) and to support them with competent evidence is completely subverted and litigation reduced to a game of chance. * * * Under those pleadings and proofs it is of no help to plaintiff to urge, and plaintiff does not urge, that defendants could be liable even though the accident had happened where and as they claimed on that theory that they were guilty of some other or different negligence than that alleged and urged in the proofs by plaintiff. Plaintiff must stand or fall on its pleadings, proofs, and theory of the case presented thereby."[10]

Evidentiary facts make and delimit rules of law and triable issues. They determine also the applicability of a given precedent. The books say so at least.[11] So does the realized experience of the law.

---

[9] *Scott* v. *Cleveland* was written for a unanimous Court by Justice Souris, a signer of Justice Smith's present opinion.

[10] For current provision see GCR 1963, 111.1(1).—Reporter.

[11] "Though the language used is very broad, it must be confined

In *Emery* the "unusual conditions" attending the defendant railroad company's Lippincott crossing in Flint, and the Court's discussion thereof, appear starting on page 680 of *Emery's* report. In that case the standout fact was that the rail crossing was so dangerous, *in the nighttime on account of deceptive overhead lighting* (this Bauman collision occurred in *broad daylight,* about midafternoon), that the public service commission had issued—prior to Emerson Emery's injury there—the not-yet-complied with order which appears by footnote on pages 671 and 672 of *Emery's* report. Thus, in each citation which the Court considered in both *Emery* and *Baldinger,* and in all of the Michigan cases that were considered by the Supreme Court of the United States in *Grand Trunk R. Co.* v. *Ives, supra,* the preliminary question was whether there was a sufficiency of adduced proof for jury consideration of the "dangerous crossing" rule.

In *Baldinger, supra* at 690, we said:

"The foregoing presentation of rule is as fair to plaintiff as he may reasonably request. Now we must ascertain whether, on due favorable view, the proof entitled plaintiff to an instruction authorizing jury determination of the posed question, that is, whether the circumstances were of such nature as to call for 'some efficient local warning,' over and above statutory requirements and the requirements

to the facts of that case, which did not call for decision of so broad a proposition." *Hogsett* v. *Ellis,* 17 Mich 351, 360.

"The language of that decision must, however, be construed with reference to the facts." *King* v. *Welborn,* 83 Mich 195, 198.

"It has often been said by this and other courts that the language of a decision must be construed with reference to and confined to the facts of that case." *Wolcott* v. *Holcomb,* 97 Mich 361, 368.

"This language must be construed with reference to the case in hand, and, in our opinion, the case cited is one which should be considered a precedent only for cases which present the same features." *Micks* v. *Mason,* 145 Mich 212, 214.

"Counsel for plaintiff cite and quote from *Greening* v. *Wallace,* 257 Mich 343. Language there found must not be removed from its setting." *In re Estate of Lucas,* 272 Mich 1, 6.

of safety regulations promulgated by the public
service commission."

And in *Ives, supra* at 421, 422, this significant
language appears:

"As a general rule, it may be said that whether
ordinary care or reasonable prudence requires a
railroad company to keep a flagman stationed at a
crossing that is especially dangerous, is a question
of fact for a jury to determine, under all the cir-
cumstances of the case, and that the omission to
station a flagman at a dangerous crossing may be
taken into account as evidence of negligence; al-
though in some cases it has been held that it is a
question of law for the court. It seems, however,
that before a jury will be warranted in saying, in
the absence of any statutory direction to that effect,
that a railroad company should keep a flagman or
gates at a crossing, it must be first shown that such
crossing is more than ordinarily hazardous: as, for
instance, that it is in a thickly populated portion
of a town or city; or, that the view of the track is
obstructed either by the company itself or by other
objects proper in themselves; or, that the crossing
is a much travelled one and the noise of approaching
trains is rendered indistinct and the ordinary sig-
nals difficult to be heard by reason of bustle and
confusion incident to railway or other business; or,
by reason of some such like cause; and that a jury
would not be warranted in saying that a railroad
company should maintain those extra precautions
at ordinary crossings in the country."

*Emery* and *Baldinger,* and their companion in
order (*Cummings* v. *Grand Trunk W. R. Co.,* 372
Mich 695), supply no occasion or precedent for a
general declaration of grade crossing war on the
railroads or for yielding to damage-suit plaintiffs
more and more of what they insatiably demand of
us. Our function instead is that of vigilant preserva-
tion of the right of both contenders to the fair

processes of·trial including jury instructions that
are applicable solely to testimonially supported
issues of fact.   Here the controlling issue is sharply
and exclusively limned by the evidentiary proof;
proof which was recorded 22 months prior to hand-
ing down of the *Emery* and *Baldinger Cases.*   It is
whether the engineer, when by credible or incredible
testimony he could and should have done otherwise,
permitted the train to run down a small truck and
its occupants as that truck slid toward the track
and then remained for a fully appreciable interval
in the path of the train; hence whether the engi-
neer's actions constituted what we know as subse-
quent and therefore actionable negligence.

Now for the "facts" which Justice Smith presents
as and for support of his position that the proof
at bar justifies submission, to a jury, of the plain-
tiff's claim that the railroad "was negligent in fail-
ing to provide more adequate crossing protection
such as lights, gates and a warning bell, and as a re-
sult thereof plaintiff was not warned of the ap-
proaching train in sufficient time to avoid collision
with it."   Such facts are supplied by copying (from
the "Argument" portion of brief) plaintiff's bold
faced point of argument No. 2:

"2. *Where the declaration alleged that defendant
was negligent in failing to provide more adequate
safeguards at the crossing, was it proper to instruct
the jury that no negligence could be charged to de-
fendant for such failure if the crossing was in a busi-
ness or residence district?*";

and then by the unbroken copying of plaintiff's en-
suing argument in support of his claim that the de-
fendant railroad was thus negligent.

I shall come to the question of legal sufficiency
of what has thus been accepted, copied, and present-
ed, stressing regularly that descriptive-restrictive

phrase *"physical* circumstances existing at the grade crossing."[12] First, though, some introductory observations are in order.

When members of an appellate court, having determined to support a critical legal position the plaintiff burden-bearer in a damage action has taken, find themselves compelled to supply what are said to be facts of sustenance by copying *in extenso* from the "Argument" portion of that plaintiff's brief, it seems to me that they reach vainly for the inadmissible nadir rather than that permissible zenith of favorable view. Favorable view does not yet mean that this or any other appellate court should adopt, in lieu of actual proof, the forensic gild zealous counsel apply to what appears and does not appear in the forwarded testimonial record, and it certainly does not mean that this Court should "extend"[13] a case like *Emery* to a case or cases presenting no *"physical* circumstances existing at the grade crossing involved in this case" which might give rise to an issue of

[12] Here is the entire paragraph from which this comes; not just a context-lifted small part thereof (*Emery* at pp 680, 681):

"Turning now to this case of *Emery* and viewing it in the light of *Staal's, Guggenheim's, Freeman's, Barnum's,* and *McParlan's* recognition of the common-law duty of ordinary care and prudence commensurate with *all* the circumstances,—relieved of the analysis-crippling semantics of 'special conditions' and the like,—there can be no doubt that the trial judge properly submitted for jury determination the question whether the physical circumstances existing at the grade crossing involved in this case required defendant railroad in the exercise of ordinary care and prudence commensurate with such circumstances to provide warning devices in addition to the ordinary wooden crossbuck sign."

[13] In *Burns* v. *Van Laan,* 367 Mich 485, 497, we contended to a stalemate for and against motion that a common-law measure of damage applicable to a personal injury case should be accorded "a natural and logical extension" to the statutory measure that is applicable to a wrongful death case. In *Burns* Justice SOURIS wrote for himself and Justices T. M. KAVANAGH, SMITH, and ADAMS. I have learned to be precautious when bland and sometimes partly concealed "extensions" like that are written up for signature. Unopposed and continued, they would in a short time make a totally unpredictable shambles of Michigan law.

"dangerous crossing." Such "extensions," like Caesar said of Cassius, "are dangerous."[14]

We test as I conceive the sufficiency of evidence to support an instruction concerning some urged point of law by direct reference to the statements and counterstatements of fact counsel make pursuant to GCR 1963, 854, 813.2, and 814.2, and then by corresponding reference to and analysis of the testimonial record; not by unstudied acceptance of the expansive polemics counsel advance in the Rule 813.3 divisions of their briefs.[15] The latter approach may be an easy-chair way to relate, in our supposedly reliable official reports, what are deemed to be the essential facts upon which questions of law depend. It is not an accurate way, however, as we shall see.

The foregoing salutation delivered, I have decided to quote *seriatim* what my Brothers holding unreservedly for this plaintiff have accepted as facts, and to enter certain mild comments below each of such quoted asseverations. By this means we may be able to ascertain whether any evidence adduced in the case will support an instruction that the jury should determine whether Mr. Bauman approached and drove onto a "dangerous crossing" within the *Emery-Baldinger* rule.

Quotation (a) from Justice Smith's opinion:

" '(a) Obstruction to plaintiff's view in approaching the crossing (Exhibits 1, 2, 3, 4, and 5, pp 2a–6a, 52a–54a)'."

*Comment:* Here is the testimony, all of it, that we are thus referred to by plaintiff's counsel and by Justice Smith:

---

[14] Shakespeare, Julius Caesar, act 1, scene 2.—Reporter.

[15] There is something more than admonitory restraint on counsel when they prepare their statements and counterstatements of fact. In such designated parts of briefs they are required to state (not argue) "the facts of the case," and to present them "without argument or bias" (Rules 813.2 and 814.2); whereas license is their right under the 813.3 and 814.3 parts of such briefs.

"*Q.* Now, as you proceeded south on M 36 that day, Mr. Cartmell—can you see from where you are? Can you see this picture in general?

"*A.* Yes, sir.

"*Q.* Will you state whether or not the photograph, plaintiff's exhibit 2, generally indicates the view that greets you as you go south toward Gregory village?

"*A.* It does, yes, sir.

"*Q.* On the day in question, whether that represents fairly the scene except for the snow on the ground.

"*A.* It does.

"*Q.* Was the ground dry that day?

"*A.* It was.

"*Q.* As you and Jim proceeded in that southerly direction on this highway, that is the view which confronted you, is that right?

"*A.* That is correct.

"*Q.* As you proceeded further, will you state whether or not you observed this, what I call a barn? It is referred to, also as a garage at the west or your righthand side.

"*A.* I did.

"*Q.* Is that a fair representation of that—

"*A.* Yes, sir.

"*Q. (Continuing)* building that was there on the day of this accident?

"*A.* Yes, sir.

"*Q.* And the billboard to the south of the building?

"*A.* Yes, sir.

"*Q.* Whether or not that obstructed your view—

\* \* \*

[Objection and discussion by court and counsel, with plaintiff's counsel resuming direct examination]

"*Q. (By Mr. Kelly) (Continuing)*—to the west— strike it, will you, Mr. Oppelt?

"I will rephrase it. Trying to get it in shape.

"Whether or not this barn building and the billboard shown in this photograph obstructed your view of the railroad tracks to the west of M 36,

"*A.* It did.

"*The Court:*  Is that exhibit 3, Mr. Kelly?

"*Mr. Kelly:*  Yes, Your Honor.

"*The Court:*  Thank you.

"*Q.* (*By Mr. Kelly*):  Now, as you were proceeding southerly, will you state whether or not you came to the point which is represented in plaintiff's exhibit 4, and contained at the left-hand side of the photograph, a two-story building with the sign on it, front of it, saying 'Bob's Body Shop'?

"Did you observe the building?

"*A.* I did.

"*Q.* And whether or not your view to the east was obstructed by that building as indicated.

"*A.* It is.

"*Q.* And was on the day in question?

"*A.* Yes, sir.

"*Q.* Now, when you got to the south end or south side of Bob's Body Shop, at your left, the easterly side of M 36, indicated at the left-hand side of the photograph, plaintiff's exhibit 5, Mr. Cartmell, I will ask you whether or not you looked in the direction to your left at that point.

"*A.* We did.

"*Q.* Whether or not the view that you had was as shown in this photograph.

"*A.* That's right.

"*Q.* From that point.

(*There was no answer.*)

"*Q.* And that includes the place down to the building with the cupola on top of it, which has been referred to as a grain elevator, setting just south of the railroad tracks?

"*A.* That is correct.

"*Q.* Did you look in that direction when you arrived at that point?

"*A.* We did.  We did.

"*Q.* Did you see any train within the distance of your view at that time?

"*A.* I did not.

"*Q*. Did you hear the whistle or bell of any train?
"*A*. I did not."

I perceive here no evidence of obstruction of view sufficient or near-sufficient to make of this a so-called "dangerous crossing" case. View of the tracks at just about all railroad crossings is obstructed to some extent before the motorist arrives at that point where he should take such self-protective measures as the law exacts of him. This plaintiff has merely selected photographed positions of view, *not* close enough to the tracks to *materially* obstruct the view of a southbound motorist to the east along the tracks, as and for proof that this was a "dangerous crossing" within the *Emery-Baldinger* rule.

Consider exhibit "G," appearing at the margin. The position of the camera was 50 feet short of the nearest rail. At that point the plaintiff could—and should—have discovered any fast or slow train that might have been approaching, from the east, within a distance of one-quarter if not one-half mile away from his driving position. The train that was coming (at the agreed rate of 30 miles per hour) had to be visible within such distance no matter what view a jury might take of the specifically conflicting testimony; referring to Mr. Cartmell's quoted testimony on the one hand and the testimony of others that the southbound truck and the westbound locomotive arrived simultaneously at the point of collisive impact.

The fact is (it was either antecedent or causative) that the plaintiff burden bearer failed to perform either of the two standard duties of a motorist when that motorist approaches a main line grade crossing, as here. The first of such duties is to slow one's speed, the better to afford time for looking both ways and for the taking of such safe preventive measures as observations may indicate. The other is the duty to

Opinion by BLACK, J.

Camera standing in center of Highway M 36 facing South East 50 ft.
North from North rail of track.
Cards showed along North rail of track are spaced at 50 ft. intervals,
from East edge of crossing.
Photograph taken Nov. 20, 1958 at Gregory, Michigan.
CAMERA HEIGHT 5' 2"

look for an approaching train *at some safe position where, the motorist's view of the tracks being wholly unobstructed, there is ample time and distance to stop short of the tracks.*

When a plaintiff motorist proves only that he looked in the direction of ultimate danger when his view of the tracks was obstructed, and saw no train, and then proves, *without intervening slowing of his speed,* that he did not look again in that direction until his motor vehicle was so close to the track that an application of its brakes resulted in its sliding up to and on the tracks, such proof hardly makes out a jury question within the *Emery-Baldinger* rule.

Quotation (b) from Justice Smith's opinion:

" '(b) The train running on no scheduled time (304a)'."

*Comment:* It is not explained, either in the mentioned brief or by any Brother seated here, how this fact is supposed to have had causal connection with the collision, or how it tended to prove a "physical" circumstance existing at the crossing. Nor did plaintiff make any claim below that he or his passenger approached the rails relying upon some knowledge or understanding that no train was coming. If at the time any trains on Grand Trunk's Pontiac to Jackson division were supposed to be running per schedule, that fact could and should have been shown. It wasn't.

As is known pretty well to veteran trial lawyers, the applicable rule appears in *Tucker* v. *Chicago & G. T. R. Co.,* 122 Mich 149, 150, 151; followed in *Schwartz* v. *Mineral Range R. Co.,* 153 Mich 40, 48. If it was once true (and it was) "that it is always train time at a railroad crossing" (44 Am Jur, Railroads, § 560, p 813),[16] it is the more true in these

---

[16] The heading of this section 560 is "Reliance on Schedule."

days of fewer and fewer passenger trains and more and more freight trains; all running on main line tracks. It is significant, all in all, that the Brethren standing here for general application of the "dangerous crossing" rule offer no explanation of their acceptance of quoted point (b).

Quotations (c), (d), (e) from Justice SMITH's opinion:

" '(c) An average of 600 motor vehicles on a State trunkline highway passing over this crossing daily (104a), contrasted with conditions at the crossing some 40 years earlier showing horsedrawn vehicles and only an occasional automobile over a dirt road, with the same crossbuck sign then in place, the only change being reflectorized letters thereon (Exhibit 11, pp 240a–244a).

" '(d) The old noisy steam locomotive (Exhibit 11) replaced by the comparatively silent diesel engine.

" '(e) School children, including those of kindergarten age, passing over the crossing several times daily (pp 111a–112a)'."

*Comment:* Here too there is no proof of "physical circumstances existing at the grade crossing involved in this case." And I am unable to find from the record that the highway was in heavy or light traffic use during that April afternoon, or that *any* other moving vehicles were nearby as the train and the pickup truck approached the crossing, or that *any* school children were in the vicinity, much less "passing over the crossing" at the time. As for the "comparatively silent" diesel-electric locomotive, the railroad's use thereof constituted no proof of "physical conditions existing at the grade crossing involved." The proof if believed simply required of the engineer that he comply most carefully with the law as regards warning whistles and ringing of the bell as the train approached the crossing. Whether

he did so comply was a typical jury question as in grade crossing cases generally and that question was duly submitted to this particular jury.

Quotation (f) from Justice SMITH's opinion:

" '(f) Operation of the engine at the time of the accident by an inexperienced acting engineer (pp 290a–303a)'."

*Comment:* If it was actually shown that the engineer was "inexperienced" as alleged, that might, depending on the proof, be evidence of negligence on the part of the railroad and it would tend to support plaintiff's theory of subsequent negligence. Certainly, though, it would constitute no evidence of "physical circumstances existing at the grade crossing involved." To apply the *Emery-Baldinger* rule the crossing itself must be shown to be "dangerous"; not something else.

Quotation (g) from Justice SMITH's opinion:

" '(g) Failure of the acting engineer to sound the bell or whistle of the engine as it approached the crossing (pp 52a–57a, 95a–100a)'."

*Comment:* This to be sure was evidence of negligence on the part of the railroad. But again, it was no evidence upon which the jury could find that the "physical circumstances existing at the grade crossing involved" brought the railroad's duty within the *Emery-Baldinger* rule.

Quotation (h) from Justice SMITH's opinion:

" '(h) Failure to have the station agent, standing nearby, give plaintiff any warning signal of the approaching train (p 482a)'."

*Comment:* This particular averment, proffered as evidence of such "physical circumstances," really takes the legal cake. The agent referred to was not only the Gregory station agent; he was also the

telegraph operator on duty.  No other employee was
there to assist him, or to heave aboard the train, as
it was due to go by the station, the customary pack-
age of mail the agent had ready.  It was not shown,
either, that the agent was a sprinter, or even that
Bob Hayes[17] might have covered enough of that dis-
tance to the crossing in time to yell or wigwag an
effective warning to the driver of the pickup truck
after the truck had come into his line of vision.
Doubtless, had the agent attempted by any means
to warn plaintiff (from that direction which was
opposite the direction from which the train was
approaching), he and thus the defendant would have
been accused of the same distractive action as was
·charged against the railroad in *Johnson* v. *New York
C. R. Co.,* 357 Mich 40.

The agent was not "standing nearby"; he was
standing in the railside doorway of the small Greg-
ory railroad station which was some 120 feet to the
west of the crossing.  Just what the agent should
have done, by way of legal duty to plaintiff, is some-
thing that was not developed or suggested below, by
cross-examination of the agent or otherwise.  Nor
is there any exposition in plaintiff's brief of any
theory that the agent could and should have been
on duty at the station, and on duty at the crossing,
at the same time.   .

One more observation:  The concluding paragraph
of Justice SMITH's opinion reads as follows:

"We agree with JusticeBLACK, and for the reasons
he has stated, that the trial judge's jury submission
of plaintiff's subsequent negligence theory was like-
wise erroneous."

I am not aware of having suggested or written at
any time that the jury instructions given below, other

---

[17] At present writing "the world's fastest human."

than such as are quoted in Justice SMITH's opinion, were erroneous.

For reasons stated I concur in reversal and remand for retrial, with award of costs on present appeal to plaintiff.

KELLY, J., concurred with BLACK, J.

O'HARA, J. (*concurring in reversal*). I agree with Mr. Justice BLACK in that plaintiff failed to sustain the burden of presentation of evidence upon which a jury might find that the physical circumstances existing at the grade crossing involved in this case gave rise to any additional duty-rule such as this Court expounded in the *Emery* and *Baldinger Cases*.*

The *Emery-Baldinger* "additional duty-rule" is not here involved.

I also agree that the instructions quoted in Mr. Justice SMITH's opinion were reversibly erroneous. I am unable to discern their relevance to any issue joined, and particularly to the "additional duty-rule."

I vote to reverse and remand, with costs to plaintiff.

---

* *Emery* v. *Chesapeake & O. R. Co.*, 372 Mich 663; *Baldinger* v. *Ann Arbor R. Co.*, 372 Mich 685.—REPORTER.