WILSON v CHESAPEAKE & OHIO RAILWAY COMPANY

Docket No. 55349. Submitted March 4, 1982, at Detroit.—Decided July 19, 1982. Leave to appeal applied for.

Donald Wilson, administrator of the estate of Audry Theresa Wilson, brought a wrongful death action against the Chesapeake & Ohio Railway Company following the death of Audry Wilson which occurred as a result of her automobile being struck by the defendant's train. The railway company appeals from a judgment for the plaintiff following a jury trial in the Oakland Circuit Court, Gene Schnelz, J., and from that court's order denying the railway company's motion for a new trial or, in the alternative, a judgment notwithstanding the verdict. Defendant contends on appeal that the trial court erred in its instructions to the jury including its instructions on the last clear chance doctrine. *Held:*

1. A jury may be instructed on the doctrine of last clear chance where the facts support the giving of such an instruction. The standard jury instruction regarding last clear chance adequately states the law and should be given in the proper circumstances.

2. In Michigan, comparative negligence has a place for the last clear chance doctrine.

3. The standard jury instruction regarding last clear chance should not have been given in this case. Since it was given and the defendant objected, the Court finds reversible error and remands for a new trial.

4. The defendant had no existing opportunity to avoid harm after discovering the decedent's peril.

5. Plaintiff's contention that the credibility of the three train crew members was in doubt on the question of whether they kept a proper lookout as they approached the crossing is not relevant to the issue of existing opportunity to avoid harm under the facts cited. Even if the jury chose to disbelieve the

REFERENCES FOR POINTS IN HEADNOTES
[1] 57 Am Jur 2d, Negligence §§ 394, 407.
[2] 4 Am Jur 2d, Appeal and Error §§ 608, 886.
[3, 4] 22 Am Jur 2d, Death § 254.

crew when they said they were looking ahead, there was no evidence by which the plaintiff could meet his burden of establishing that the car had been on the tracks to be seen at a point early enough so that the train could have been successfully stopped and that the crew had negligently failed to keep a lookout at that point.

6. The Court of Appeals reviews a denial of a motion for a judgment notwithstanding the verdict by asking whether, after viewing all of the facts and all legitimate inferences from those facts in a light most favorable to the party opposing the motion, reasonable persons could differ. If so, the question is resolved by the trier of fact. Here, logic and the physical evidence adduced at trial also compel reversal.

Reversed and remanded.

BEASLEY, J., dissented. He agrees with the majority that under some circumstances the last clear chance jury instruction may be given together with a comparative negligence instruction. However, he believes that the majority has interpreted the evidence too restrictively. He feels resolution of the conflicting theories of what happened was for the jury and he would not say that there is no possible basis upon which reasonable persons could find liability. He would affirm.

## OPINION OF THE COURT

1. NEGLIGENCE — LAST CLEAR CHANCE — JURY INSTRUCTIONS.

The standard jury instruction relating to the doctrine of last clear chance adequately states the law in Michigan and should be given in the proper circumstances (SJI 14.01).

2. APPEAL — JUDGMENT NOTWITHSTANDING VERDICT — STANDARD FOR REVIEW — TRIER OF FACT.

The standard for review of a lower court determination to deny a motion for a judgment notwithstanding the verdict is whether, after viewing the facts and all legitimate inferences therefrom in the light most favorable to the party opposing the motion, reasonable persons could differ; if they could, the question is one for the trier of fact.

## DISSENT BY BEASLEY, J.

3. NEGLIGENCE — WRONGFUL DEATH — EVIDENCE.

A jury is entitled to draw reasonable inferences from the objective facts of the collision involved in a wrongful death case and is not limited to the version of the collision testified to by the defendant's witnesses where the only witnesses testifying to having seen the collision were employees of the defendant.

4. NEGLIGENCE — WRONGFUL DEATH — EVIDENCE — CONFLICTING
    THEORIES — JURY QUESTIONS — APPEAL.
    *The resolution of conflicting theories of what happened based
    upon the evidence in a wrongful death action is for the jury;
    the jury's finding of liability, after resolving the conflicting
    theories, should not be disturbed on appeal where there is a
    possible basis upon which reasonable persons could find liabil-
    ity.*

*Gemuend & Nagi* and *Martin, Bacon & Martin,
P.C.,* for plaintiff.

*Patterson, Patterson, Whitfield, Manikoff, Ter-
nan & White* (by *Gerald G. White* and *Gretel S.
Robinson),* for defendant.

Before: R. M. MAHER, P.J., and BEASLEY and P. J.
MARUTIAK,* JJ.

P. J. MARUTIAK, J. This case involves the tragic
death of plaintiff's decedent at the intersection of a
rural road and defendant Chesapeake & Ohio Rail-
way Company's railway in western Oakland
County on September 16, 1974. Defendant appeals
from a substantial jury verdict and denial of its
motion for a judgment notwithstanding the verdict
or, in the alternative, for a new trial.

The proofs at trial showed that the decedent,
Audry Wilson, was on her way to work at about 8
a.m. on September 16, 1974. As she approached
her workplace from the east (westbound) on Ward-
low Road, she came to a marked railroad crossing
with a standard crossbuck and stop sign.

Other testimony showed that the weather was
clear, the temperature approximately 50 degrees
and that there was dew on the ground, and proba-
bly on the automobile's windows. On the east side
of the railroad tracks, north of Wardlow Road, a

---

* Circuit judge, sitting on the Court of Appeals by assignment.

private tree farm raised some "rather tall maples" abutting the railroad property beside Wardlow Road and large pines which "[did] not totally obscure the train or tracks [from decedent's position at the stop sign] but did create a distraction and did obscure partially the vision of oncoming motorists which would be proceeding west on Wardlow".

The defendant's train, southbound on the tracks, was proceeding at approximately 30-32 mph. Testimony showed that the train was approximately 1 mile long and from 14 to 16 feet high. In the locomotive cab were the train's engineer, William Lee Mills, a brakeman, Gerald Heddon, and a fireman, Kenneth Little. Mills, the engineer, sat on the right side of the engine, facing forward. Beside him, sitting in tandem, the brakeman and fireman also faced forward looking through a window on the left side of the engine. The right and left sides of the cab are partitioned by the engineer's console which partially blocked the men's vision directly to their east or west. Additionally, the engineer's vision is restricted to an arc of 15 degrees from the front of the engine to the nose of the engine; the reverse is true of the brakeman and the fireman.

Mills testified that he had passed this crossing many times. After negotiating a curve approximately 3/4 to 1 mile from the crossing, he had a clear view of the tracks. At a whistle post, between 1,200 and 1,500 feet north of the crossing, Mills began to blow the train horn as he was required to do. The headlights and engine bell were also activated. Mills testified that, at the whistle post, he was looking forward down the railroad tracks. He saw nothing on the tracks at that time. Mills also said that he saw nothing on the tracks at 1,000

feet from the crossing or at 750 feet from the crossing. Mills continued to look forward until some point less than approximately 700 feet from the Wardlow crossing. At that point, in the later stages of his approach to the crossing, Mills turned for "just a second or two" to speak to fireman Little. Mills saw the other men facing forward until he spoke to Little. At that time, "very close to the crossing", he saw the brakeman's expression change to a look of alarm. Mills immediately looked forward.

Ahead, approximately 300-500 feet from the train, Mills saw a stationary car in the crossing. Mills said he never saw the car move onto the tracks. He immediately put the train into emergency stop, shut off the throttle, and began to blow short bursts on the train's air horn to get the driver's attention. At this point, Mills noted mile post 60 positioned approximately half way between the engine and the crossing (300-500 feet).

Mills said that in the terrifying seconds before the crash he could see movement in the car "as though an attempt or shift to do something was being done inside the car. * * * rather violent movement trying to shift the vehicle to start the car or something".

The train struck the automobile and continued down the track for 1,126 feet. Mills stated that the brakes operated normally under full emergency application and further testified that in order to have made an emergency stop before striking the car he would have had to put the emergency brake on at the whistle post.

The testimony of Heddon and Little substantiates that of engineer Mills in that the car was first sighted on the tracks when the train was between 300-500 feet from the crossing. Both men had

turned to look at Mills when he spoke to Little, Heddon merely glancing over. Heddon was the first to see the car, yelled and the others immediately turned to look. Both Little and Heddon testified that the windows of the car were covered with "heavy dew" but that they could see the person inside the car moving about.

A number of witnesses testified concerning the safety of the Wardlow Road crossing. Several witnesses indicated that brush and growth close to the track made the crossing quite dangerous.

At the close of the proofs, the trial court instructed the jury using SJI 14.01, the amended "Last Clear Chance" instruction, over the objection of defense counsel.

On October 14, 1980, the jury returned a verdict in the amount of $1,456,721. The jury found that Mrs. Wilson was 40% negligent and that the defendant was 60% negligent. A judgment was, therefore, entered in the amount of $874,032.60. This appeal followed the trial court's denial of defense motions for a new trial or judgment notwithstanding the verdict.

We are asked for the first time to rule on the doctrine of last clear chance as that doctrine applies to comparative negligence in Michigan.[1] We

[1] *Zeni v Anderson,* 397 Mich 117, 152-156; 243 NW2d 270 (1976), adopted the position of the Restatement Torts, 2d:

" '§ 479. Last Clear Chance: Helpless Plaintiff

" 'A plaintiff who has negligently subjected himself to a risk of harm from the defendant's subsequent negligence may recover for harm caused thereby if, immediately preceding the harm,

" '(a) the plaintiff is unable to avoid it by the exercise of reasonable vigilance and care, and

" '(b) the defendant is negligent in failing to utilize with reasonable care and competence his then existing opportunity to avoid the harm, when he

" '(i) knows of the plaintiff's situation and realizes or has reason to realize the peril involved in it or

" '(ii) would discover the situation and thus have reason to realize

are also asked to rule on the trial court's instructions to the jury.

Comparative negligence came to Michigan, not unexpectedly, via court decision in the absence of legislative action. *Placek v Sterling Heights,* 405 Mich 638; 275 NW2d 511 (1979). *Placek* does not address a number of tort concepts, although Justice COLEMAN, in her partially concurring and partially dissenting opinion, perceptively saw a number of jural demons lurking in the wings. *Placek,* 700, fn 11.

What is the role of last clear chance in a "pure" comparative negligence system? Should we abandon it as one commentator suggests?[2] A number of states have said so.[3] Should we carry on with the doctrine as a form of jury instruction if the facts support giving such an instruction?

---

the peril, if he were to exercise the vigilance which it is then his duty to the plaintiff to exercise.' "

" '§ 480. Last Clear Chance: Inattentive Plaintiff

" 'A plaintiff who, by the exercise of reasonable vigilance, could discover the danger created by the defendant's negligence in time to avoid the harm to him, can recover if, but only if, the defendant

" '(a) knows of the plaintiff's situation, and

" '(b) realizes * * * that the plaintiff is inattentive and therefore unlikely to discover his peril in time to avoid the harm, and

" '(c) thereafter is negligent in failing to utilize with reasonable care, and competence his then existing opportunity to avoid the harm.' " (Footnotes omitted.)

However, the Supreme Court did not consider the "humanitarian doctrine" incorporated in § 480(b) which would allow recovery where both plaintiff and defendant were inattentive.

[2] Schwartz, Comparative Negligence, ch 7, pp 129-140.

[3] Alaska, *Kaatz v State,* 540 P2d 1037 (Alas, 1975); California, *Li v Yellow Cab Co of California,* 13 Cal 3d 804, 824-825; 119 Cal Rptr 858, 872; 532 P2d 1226, 1240-1241 (1975); Connecticut, Conn Gen Stat, § 52-572h(c); Florida, *Loftin v Nolin,* 86 So 2d 161 (Fla, 1956); *Hoffman v Jones,* 280 So 2d 431 (Fla, 1973); Maine, *Cushman v Perkins,* 245 A2d 846 (Me, 1968); Nevada, *Davies v Butler,* 95 Nev 763; 602 P2d 605 (1979); Oregon, Ore Rev Stat, ch 18, § 18.475(1); Texas, *de Anda v Blake,* 562 SW2d 497 (Tex Civ App, 1978); *Scott v Webb,* 583 SW2d 846 (Tex Civ App, 1979); Wyoming, *Danculovich v Brown,* 593 P2d 187 (Wy, 1979).

We choose the latter course and agree that comparative negligence has a place for the last clear chance doctrine. The SJI was given here. We agree that the SJI adequately states the law and that it should be given in the proper circumstances. *Zeni v Anderson,* 397 Mich 117, 153-155; 243 NW2d 270 (1976); *Massey v Scripter,* 401 Mich 385, 392-393; 258 NW2d 44 (1977).

Should the instruction have been given in this case? No, and because it was and the defendant objected, we find reversible error and remand the case for a new trial.

The position of the Restatement Torts, 2d, §§ 479 and 480, was adopted in *Zeni, supra,* and the restatement position forms the basis for SJI 14.01. In pertinent part, that standard jury instruction reads:

"Even if you decide [plaintiff/decedent] negligently subjected [himself/herself] to the risk of harm from the defendant's negligence, the plaintiff may still recover for harm caused by the defendant's negligence if, immediately preceding the harm—

"a. the [plaintiff/decedent] was unable to avoid it by exercise of reasonable vigilance and care, and

"b. the defendant was negligent in failing to use with reasonable care [his/her] *existing opportunity to avoid the* [plaintiff's/decedent's] *harm,* when [he/she]

"i. knew of the [plaintiff's/decedent's] situation, and realized or had reason to realize the peril involved in it, or

"ii. could have discovered the situation if [he/she] had exercised the vigilance which it was then [his/her] duty to the [plaintiff/decedent] to exercise.

"Even if you decide [plaintiff/decedent], by the exercise of reasonable vigilance, could have discovered the danger created by the defendant's negligence in time to avoid the harm to [him/her], the plaintiff can still recover, if—

"a. the defendant knew of the [plaintiff's/decedent's] situation, and

"b. the defendant realized that the [plaintiff/decedent] was inattentive and therefore unlikely to discover [his/her] peril in time to avoid the harm, and

"c. the defendant was negligent after that in failing to use with reasonable care [his/her] *existing opportunity to avoid the harm.*" (Emphasis added.)

Our review of the facts leads us to conclude that this defendant had no existing opportunity to avoid harm after discovering the decedent's peril. The evidence produced at trial showed that:

(1) The three crew members had a duty to look ahead when approaching a crossing;

(2) From a point 3/4 to 1 mile from the crossing, the engineer had a clear view of the crossing;

(3) The engineer began to blow the train whistle at the whistle post, 1,250 feet north of the crossing; at this point, the engineer and brakeman were both looking ahead at the crossing and saw nothing on the tracks;

(4) The engineer "believed" he saw nothing on the tracks at 1,000 feet from the crossing;

(5) The engineer saw nothing on the tracks at 750 feet from the crossing;

(6) The brakeman did not think the car was on the tracks at the 750-foot point, although he could not positively state he had not been looking away;

(7) At some point *after* the 750-foot point had been passed, the engineer turned and spoke to the fireman; the brakeman momentarily glanced at the engineer and then turned back to see decedent's car on the tracks;

(8) The engineer estimated he only turned away from the front for 1 to 2 seconds;

(9) The men first saw the car on the tracks when

the train was approximately 300 to 500 feet from the crossing, and the engineer immediately put the train into emergency braking position;

(10) None of the men saw the car move onto the tracks;

(11) The train came to a stop 1,126 feet *after* the crossing; and

(12) The brakes operated properly under full emergency application.

In *Zeni v Anderson, supra,* the Supreme Court held that the only threshold to cross is that plaintiff may possibly be contributorily negligent. Yet, because the Court had the issue before it of whether the last clear chance doctrine required that the negligence of the plaintiff had come to rest before last clear chance could be applied, the Supreme Court did not decide the issue before us; whether the facts adduced at trial indicate that the defendant had an "existing opportunity to avoid the harm".

Plaintiff argues that the credibility of the three crew members in the locomotive cab was in doubt on the question of whether they kept a proper lookout as they approached the crossing because none of the men saw the car move onto the tracks; the engineer turned his head and spoke to the fireman; the fireman did not remember where he was looking immediately before the car was sighted on the tracks; the brakeman was not sure how long he turned his head to listen to the engineer; the brakeman was not sure where he was looking at the 750-foot point; the crew had a clear view from approximately one mile from the crossing; and the train was stopped in less than 1,400 feet.

However, we find that the question of the crew's

credibility is not relevant to the issue of existing opportunity to avoid harm, especially on the facts cited by the plaintiff. The evidence is uncontroverted that the train took a minimum of 1,426 feet to stop—the brakes were thrown at approximately 300-500 feet from the crossing, and the train stopped 1,126 feet after the crossing. The evidence is also uncontradicted that the crew was looking ahead at the whistle post and nothing was on the tracks at this point, 1,250 feet from the crossing. Even if the jury chose to disbelieve the crew when they said they were looking ahead, there was no evidence to even suggest the car was on the tracks to be seen at that time. By the 750-foot point, when the brakeman was unsure where he was looking, it was already too late to stop the train. Plaintiff had to establish that the car had been on the tracks to be seen at a point early enough so that the train could have been successfully stopped, and that the crew had negligently failed to keep a lookout at that point; the jury's belief of the crew's statement could not manufacture the first fact.

We review a denial of a motion for a judgment notwithstanding the verdict by asking ourselves whether, after viewing all of the facts and all legitimate inferences from those facts in a light most favorable to the party opposing the motion, reasonable persons could differ. If so, the question is resolved by the trier of fact. *Hughes v Allis-Chalmers Corp*, 96 Mich App 175, 180; 292 NW2d 514 (1980). Logic and the physical evidence adduced at trial compels reversal.

The other issues before us were correctly decided by the trial judge and should govern the new trial.

Reversed and remanded for a new trial. Costs to appellant.

R. M. Maher, P.J., concurred.

Beasley, J. *(dissenting).* I respectfully dissent. I agree with the majority that under some circumstances a last clear chance jury instruction may be given together with a comparative negligence instruction.

I disagree with the restrictive interpretation the majority has put upon the evidence. This was a wrongful death case. The only witnesses testifying to having seen the collision were employees of defendant. The jury was entitled to draw reasonable inferences from the objective facts of the collision and should not be limited to the version testified to by defendant's witnesses.

There were conflicting theories of what happened based upon the evidence. Resolution of those conflicts was for the jury.[1] I am not prepared to say that there is no possible basis upon which reasonable persons could find liability.[2] I would affirm.

---

[1] *Beasley v Grand Trunk W R Co,* 90 Mich App 576, 584-585, 590; 282 NW2d 401 (1979).

[2] *McKinch v Dixon,* 391 Mich 282, 287; 215 NW2d 689 (1974); *Bauman v Grand Trunk W R Co,* 376 Mich 675, 687; 138 NW2d 285 (1965).