ZYSKOWSKI v HABELMANN

Docket No. 77598. Submitted November 7, 1985, at Detroit.—Decided April 7, 1986.

Plaintiff, Edwin Zyskowski, as the personal representative of the estate of his deceased son, Bruce Zyskowski, filed a wrongful death suit in Wayne Circuit Court against defendants Gerald G. Habelmann, the City of Detroit, and the Wayne County Board of Road Commissioners. The decedent was struck and killed by a motorist while walking on Outer Drive in Detroit's River Rouge Park. Plaintiff alleged negligence against the motorist, defendant Habelmann, and negligence and intentional nuisance against defendants city and board of road commissioners for their alleged failure to maintain the street lights along Outer Drive. At the close of the proofs, the circuit court, Roland L. Olzark, J., directed a verdict for the city on the negligence count. The jury found no cause of action on the remaining negligence and nuisance counts against all of the defendants. Plaintiff appealed. *Held:*

1. A governmental agency is statutorily immune from tort liability in the performance of a governmental function. The design, construction and maintenance of a road constitutes an exercise of governmental function, however a statutory exception to immunity provides that a governmental agency is not

REFERENCES

Am Jur 2d, Automobiles and Highway Traffic § 420.

Am Jur 2d, Evidence §§ 370, 830, 1104.

Am Jur 2d, Highways, Streets and Bridges §§ 103 *et seq.*

Am Jur 2d, Municipal, School, and State Tort Liability § 133.

Am Jur 2d, Negligence §§ 306, 386 *et seq.*

Liability, in motor vehicle-related cases, of governmental entity for injury, death, or property damage resulting from defect or obstruction in shoulder of street or highway. 19 ALR4th 532.

Admissibility, weight, and sufficiency of bloodgrouping tests in criminal cases. 2 ALR4th 500.

Necessity and sufficiency of proof that tests of blood alcohol concentration were conducted in conformance with prescribed methods. 96 ALR3d 745.

See also the annotations in the ALR3d/4th Quick Index under Automobiles and Highway Traffic; Blood Test; Last Clear Chance.

immune from liability for improperly maintained roads which are under its jurisdiction. Proper maintenance, in this case, includes maintenance of the lighting along Outer Drive since it affects the safety of motorists using the drive. Jurisdiction over the proper maintenance of Outer Drive, a county road, rests with the county. The county retained its duty to maintain the lights on Outer Drive, in spite of an agreement with the city providing for the city to assume that duty.

2. Since the city has no jurisdiction over the maintenance of Outer Drive, the circuit court properly directed a verdict in the city's favor on plaintiff's claim of negligence for failure to properly maintain the lights on Outer Drive.

3. The question of whether the county had a duty to maintain the lighting as part of the maintenance of Outer Drive was properly a legal question for the court to decide; it was not a factual issue for the jury to decide. The circuit court's failure to make this legal determination was an error which required reversal.

4. The circuit court properly instructed the jury on plaintiff's intentional nuisance claims against both governmental defendants that a party may be found liable for an intentionally created nuisance if he intends to bring about a condition which is harmful, offensive or dangerous to persons or property and if he knew or must have known that harm was substantially certain to follow as a result of his actions. A "harm might result" instruction as plaintiff requested would not have been a proper instruction.

5. The testimony of the Wayne County medical examiner, offered by defendant Habelmann to prove, through an analysis of the alcohol content in the decedent's blood, that the decedent was intoxicated had sufficient foundation for its admission into evidence. The medical examiner's testimony established that the blood sample was timely taken from the body of the decedent, by the medical examiner and that the instruments he used were sterile. Additionally, the blood was properly preserved and labeled. Furthermore, his testimony established that the blood sample was transported, tested by a lab technician and analyzed by a doctor under his supervision and in accordance with normal procedures.

6. The medical examiner was well qualified by his knowledge, skill, experience, training and education to offer testimony as to the speed of defendant Habelmann's vehicle when it struck the decedent, based on the condition of decedent's body after the accident. Therefore the circuit court did not err or abuse its

discretion in refusing to strike the medical examiner's testimony on this issue.

7. The circuit court did not abuse its discretion in determining that an off-duty police officer, who came upon the scene shortly after the accident, was not qualified to give an opinion as to the speed of defendant Habelmann's vehicle. The officer had neither the training nor the experience necessary to estimate speed with the facts available to him.

8. The circuit court properly instructed the jury on excused violation of the assured clear distance statute due to a sudden emergency. The evidence established that the decedent stepped from the right side of the road into the path of defendant Habelmann's approaching vehicle immediately or shortly before impact and that defendant Habelmann had no opportunity to stop his vehicle before striking the decedent, especially in view of the existing lighting conditions.

9. The circuit court did not err in refusing to instruct the jury on last clear chance, as plaintiff requested. The instruction was not warranted, since there was no evidence to suggest that defendant Habelmann could have seen the decedent in time to avoid the accident.

Affirmed, except as to the verdict on the negligence count with respect to defendant Board of Wayne County Road Commissioners, and remanded.

1. HIGHWAYS — GOVERNMENTAL IMMUNITY.

A governmental agency is statutorily immune from tort liability in the performance of a governmental function; the design, construction and maintenance of a road constitutes an exercise of governmental function, however a statutory exception to immunity provides that a governmental agency is not immune from liability for improperly maintained roads which are under its jurisdiction (MCL 691.1402, 691.1407; MSA 3.996[102], 3.996[107]).

2. HIGHWAYS — GOVERNMENTAL IMMUNITY.

The governmental immunity act limits liability for highway maintenance to the governmental agency having jurisdiction over the road; jurisdiction over county roads is placed exclusively on the county by statute; a county cannot divest itself of such jurisdiction by a maintenance agreement with a local municipality (MCL 224.21; MSA 9.121).

3. EVIDENCE — BLOOD SAMPLE ANALYSIS.

A party seeking introduction into evidence of a blood sample analysis must show that the blood was timely taken from a

particular identified body by an authorized licensed physician, medical technologist, or registered nurse designated by a licensed physician, that the instruments used were sterile, that the blood taken was properly preserved or kept, and labeled, and if transported or sent, the method and procedures used therein, the method and procedures used in conducting the test, and that the identity of the person or persons under whose supervision the tests were conducted be established; compliance with the first six criteria requires the testimony of the medically qualified person who took the blood sample; compliance with the last three criteria may be established by either direct or circumstantial evidence.

4. AUTOMOBILES — NEGLIGENCE — ASSURED CLEAR DISTANCE — SUDDEN EMERGENCY.

For the sudden emergency doctrine to apply an "emergency" must have existed and the circumstances attending the accident must present a situation that is "unusual or unsuspected".

5. NEGLIGENCE — LAST CLEAR CHANCE.

A plaintiff, who by the exercise of reasonable vigilance could discover the danger created by the defendant's negligence in time to avoid the harm to him, can recover if the defendant knew of the plaintiff's situation and realized that the plaintiff was inattentive and failed to utilize with reasonable care and competence his opportunity to avoid the harm.

*Kelman, Loria, Downing, Schneider & Simpson* (by *Alan B. Posner,* for plaintiff.

*Dickinson, Brandt, Hanlon, Becker & Lanctot* (by *Charles A. Pfeffer),* and *Gromek, Bendure & Thomas* (by *Nancy L. Bosh),* for defendant Habelmann.

*Laurel McGiffert,* Assistant Corporation Counsel, for defendant City of Detroit.

*Wayne County Corporation Counsel* (by *Glen H. Downs),* and *Fitzgerald, Hodgman, Kazul, Rutledge, Cawthorne & King, P.C.* (by *Vincent C. Rabaut, Jr.* and *Louann Van Der Wille),* for the Board of County Road Commissioners.

Before: Shepherd, P.J., and J. H. Gillis and P. J. Clulo,* JJ.

Shepherd, P.J. Plaintiff, Edwin Zyskowski, commenced this wrongful death action as personal representative of the estate of his son the deceased, Bruce Zyskowski, who was struck and killed by a motorist during the early morning hours of March 15, 1980, while walking on Outer Drive in Detroit's River Rouge Park. The complaint alleged negligence against the motorist, defendant Habelmann, and negligence and intentional nuisance against defendants City of Detroit and the Wayne County Board of Road Commissioners for their alleged failure to maintain the street lights along the road. From a March 8, 1984, jury verdict of no cause of action, plaintiff appeals as of right, alleging that there were a number of errors in the trial below.

Decedent was at the home of a friend drinking and playing cards before his death. Decedent's brother testified that decedent consumed about four mixed drinks before leaving at about 1:30 a.m. He went for a walk in Rouge Park, as he often did at night. At about 3 a.m. he was struck by a vehicle driven by defendant Habelmann in the right southbound lane of Outer Drive about 600 to 800 feet north of Warren Avenue in Detroit. Habelmann testified that he was driving at between 25 to 30 miles per hour when he simultaneously saw and hit a brown object that appeared in his path. Over plaintiff's objections, the court permitted Wayne County Medical Examiner Dr. Werner Spitz to testify that decedent had a blood alcohol level of .18 percent at the time of his death. Dr. Spitz opined that a person in that

---

* Circuit judge, sitting on the Court of Appeals by assignment.

condition would likely have impaired judgment, tunnel vision and no depth perception.

Habelmann and the investigating police officer testified that the nearby street lights were not working at the time of the accident. Outer Drive is a county road over which defendant Wayne County Road Commission admitted jurisdiction for maintenance and repair. However, according to the testimony of officials from both the city and the county, although the county owns the lights, the city, pursuant to a 1928 agreement, was responsible for the maintenance and relamping of the lights. There was also testimony by a city official that the lights were strictly intended for ornamental use. Several city and county employees also testified that there had been discussions between the city and the county and within the city about making improvements to the lighting along Outer Drive in Rouge Park.

At the close of the proofs, the trial court directed a verdict for the city on the negligence count. The jury found no cause of action on the remaining negligence and nuisance counts against all of the defendants. We reverse the verdict on the negligence count as to the county only and remand for a new trial. We affirm the jury's verdict of no cause of action on the nuisance counts and on the negligence count against defendant driver. We also affirm the directed verdict in favor of the city on the negligence count.

I

Plaintiff first argues that the trial court should have instructed the jury that the county had the duty to maintain the lights along the county road rather than leaving resolution of the duty issue to the jury.

By statute, governmental units are immune from tort liability when engaged in the exercise or discharge of a governmental function. MCL 691.1407; MSA 3.996(107). The design, construction and maintenance of a road constitutes the exercise of a governmental function. *Potes v State Highway Dep't,* 128 Mich App 765, 768; 341 NW2d 210 (1983). However, a statutory exception to immunity provides that an agency is not immune from liability for improperly maintained roads *under the agency's jurisdiction.* MCL 691.1402; MSA 3.996(102) states in part:

"Each governmental agency *having jurisdiction* over any highway shall maintain the highway in reasonable repair so that it is reasonably safe and convenient for public travel. Any person sustaining bodily injury or damage to his property by reason of failure of any governmental agency to keep any highway *under its jurisdiction* in reasonable repair, and in condition reasonably safe and fit for travel, *may recover the damages suffered by him from such governmental agency."* (Emphasis added.)

Jurisdiction over county roads is expressly conferred upon the county in MCL 224.21; MSA 9.121, which provides in part:

"It is hereby made the duty of the counties to keep in reasonable repair, so that they shall be reasonably safe and convenient for public travel, all county roads, bridges and culverts that are within their jurisdiction and under their care and control and which are open to public travel."

At trial, the city and county each denied responsibility for maintaining the lighting, although the county admitted that it had responsibility for maintaining Outer Drive, a county road. The case law is clear that MCL 691.1402 is to be strictly

construed and "jurisdiction" is given a narrow interpretation. *Bennett v Lansing,* 52 Mich App 289, 294-295; 217 NW2d 54 (1974), *lv den* 399 Mich 840 (1977), *Potes, supra,* p 769. Governmental immunity limits liability to the single governmental agency which has jurisdiction of the road at the time of the accident. 128 Mich App 769. Jurisdiction of county roads is placed exclusively on the county by statute. Moreover, the county cannot divest itself of jurisdiction over county roads by a maintenance agreement with a local municipality, as was the case here. *Bennett, supra; Potes, supra; Beyer v Fraternal Order of Eagles, Aerie No 668,* 123 Mich App 492; 333 NW2d 314 (1983). This Court stated in *Bennett, supra,* pp 295-296 (failure of the city to maintain a traffic light at the intersection of two state trunk lines):

"While at first blush it seems odd that the state must answer for the omission of a local unit of government, it must be remembered that if local units of government were not absolved of liability with respect to maintenance of state trunkline highways, local units of government would be less willing to undertake the responsibility of said maintenance on behalf of the state."

Since the city in the present case clearly did not have jurisdiction over Outer Drive, it is immune from tort liability for any alleged failure to properly maintain the road or lighting, and the trial court appropriately entered a directed verdict in favor of the city on the negligence claim. The duty, if any, to maintain the lighting rested with the county and will be addressed next.

Plaintiff requested an instruction "that maintenance of the highway includes maintenance of lighting along the highway". The trial court refused to give the instruction and instead gave the

jury a general instruction that the governmental agency having jurisdiction of the road had a duty to maintain the road in reasonable repair "so that it is reasonably safe and convenient for public travel".

In effect, the court left the hotly contested issue of duty to maintain the lighting to the jury. We agree with plaintiff that the question of whether the county had a duty to maintain the lighting as part of the maintenance of the road under MCL 691.1402 is a question of law for the court and not a factual issue for the jury. See *Anderson v Macomb Road Comm*, 143 Mich App 735; 372 NW2d 651 (1985), *Moerman v Kalamazoo Road Comm*, 129 Mich App 584; 341 NW2d 829 (1983), *rev'd on other grounds on reh* 141 Mich App 154 (1985). The trial court's failure to make this legal determination requires reversal.

As noted above, the liability of a governmental agency for injuries caused by improperly maintained roads is purely statutory. The statute, however, imposes an important limitation on liability:

"The duty of the state and the county road commissions to repair and maintain highways, and the liability therefor, shall extend only to the improved portion of the highway designed for vehicular travel and shall not include sidewalks, crosswalks or any other installation outside of the improved portion of the highway designed for vehicular travel." MCL 691.1402; MSA 3.996(102).

The phrase "improved portion of the highway designed for vehicular traffic" is generally given an expansive interpretation. In *Bennett, supra,* a traffic light was held to be an integral part of the improved portion of a highway. Similarly, in *Salvati v Dep't of State Highways*, 415 Mich 708; 330 NW2d 64 (1982), the Supreme Court held that

traffic signs were part of the improved portion of the highway. The Supreme Court stated:

"A traffic sign, once erected, becomes an integral part of the physical structure of the highway, and thus the duty to maintain a highway in reasonable repair encompasses the maintenance of traffic signs. A governing unit may incur liability under the broad concept of 'traffic sign maintenance' in the following ways: for failing to properly maintain a sign placed on the roadway, *O'Hare v Detroit,* 362 Mich 19; 106 NW2d 538 (1960); for failing to erect any sign or warning device at a point of hazard, *Bonneville v Alpena,* 158 Mich 279; 122 NW 618 (1909); *Mullins v Wayne County,* 16 Mich App 365; 168 NW2d 246 (1969); for positioning an improper system of signs on the roadway, *National Bank of Detroit v Dep't of State Highways,* 51 Mich App 415; 215 NW2d 599 (1974); or for placing a sign which inadequately informs approaching motorists of a hazard, *Lynes v St Joseph County Road Comm,* 29 Mich App 51; 185 NW2d 111 (1970)." (Footnote omitted.) 415 Mich 715.

In *Pate v Dep't of Transportation,* 127 Mich App 130, 135; 339 NW2d 3 (1983), this Court, relying on *Salvati,* held that once a traffic sign is erected, it becomes an integral part of the improved portion of a road and thereafter the statute imposes a duty to maintain the sign in proper repair.

Another panel of this Court recently observed that "the statutory duty extends to the maintenance of conditions that affect the safety of motorists using the improved portion of the highway designed for vehicular travel". *Moerman, supra,* p 562. In the present case it is clear that the lighting on a road affects the safety of motorists using the improved portion of the highway. In many urban areas street lighting is an integral and necessary part of road design. We conclude that once the county installed the lights along Outer Drive, it

assumed a duty to maintain the lights in proper repair. While the reasonableness of the county's actions and the adequacy of the lighting (as well as the cause of the accident) were questions for the jury, the determination of which governmental agency had the statutory duty to repair and maintain the street lighting and whether the lights were part of the "improved portion" of the road were questions for the court. Accordingly the verdict with respect to defendant road commission's negligence must be reversed.

## II

The trial court gave the following instruction to the jury on plaintiff's intentional nuisance claims against both governmental defendants:

"Now a nuisance is a condition which is harmful, offensive or dangerous to persons or property.

"An intentional nuisance is one wherein the creator intended to bring about the condition which is in fact found to be a nuisance.

"Where a party intends to bring about a condition which is dangerous and the party knew or must have known that harm was *substantially certain to follow* as a result of the defendant's actions, then that party may be found liable for an intentionally created nuisance." (Emphasis added.)

Plaintiff had sought an instruction that substituted "might result" for "substantially certain to follow". On appeal he again asserts that the "might result" instruction is the proper test. This issue is without merit.

The "substantially certain" test can be traced to footnote 2 of Justice Moody's concurring opinion in *Rosario v Lansing,* 403 Mich 124, 143; 268 NW2d 230 (1978), which quoted the following language from Prosser, Torts (4th ed), § 87:

"Occasionally [intentional nuisances] proceed from a malicious desire to do harm for its own sake; but more often they are intentional merely in the sense that the defendant has created or continued the condition causing the nuisance *with full knowledge* that the harm to the plaintiff's interests is substantially certain to follow." (Emphasis in original.)

Since *Rosario,* this Court has consistently employed the "substantially certain" test given by the trial court in the present case. See *Ford v Detroit,* 91 Mich App 333; 283 NW2d 739 (1979), *Cobb v Fox,* 113 Mich App 249, 257-258; 317 NW2d 583 (1982), *Ovist v Hancock,* 123 Mich App 276, 278-279; 333 NW2d 250 (1983), *Pate, supra,* p 110 ("substantially likely"); *Jenkins v Detroit,* 138 Mich App 800, 806; 360 NW2d 304 (1984), *Sanford v Detroit,* 143 Mich App 194, 199; 371 NW2d 904 (1985).

In *Keiswetter v Petoskey,* 124 Mich App 590, 597-598; 335 NW2d 94 (1983), *lv den* 417 Mich 1100.34 (1983), this Court quoted the similar definition found in 4 Restatement Torts 2d, § 825:

"To be 'intentional,' an invasion of another's interest in the use and enjoyment of land, or of the public right, need not be inspired by malice or ill will on the actor's part toward the other. An invasion so inspired is intentional, but so is an invasion that the actor knowingly causes in the pursuit of a laudable enterprise without any desire to cause harm. It is the knowledge that the actor has at the time he acts or fails to act that determines whether the invasion resulting from his conduct is intentional or unintentional. It is not enough to make an invasion intentional that the actor realizes or should realize that his conduct involves a serious risk or likelihood of causing the invasion. He must either act for the purpose of causing it or know that it is resulting or is *substantially certain to result* from his conduct." (Emphasis added.)

The trial court did not err in using the "substantially certain" test rather than plaintiff's unfounded "might result" instruction.

## III

Defendant Habelmann offered Wayne County Medical Examiner Dr. Werner Spitz who was allowed to testify that a blood alcohol test performed at this office showed decedent's blood alcohol content was .18 percent at the time of his death. Dr. Spitz added that, in this condition, a man of decedent's age and weight would likely have significantly impaired judgment, tunnel vision, and no depth perception. Plaintiff, after voir dire, objected to the admission of this evidence on the ground that the foundation was insufficient. Plaintiff's primary objection to this evidence is that although Dr. Spitz drew the blood from the body, he did not actually perform the blood alcohol test, and the defendants should have called the lab technician who performed the test, or at least the lab supervisor, Dr. Mumford. The court ruled that it was "satisfied that the integrity of the test result [was] preserved" and that "the proper procedures [had] been followed".

Dr. Spitz testified that he performed the autopsy on decedent and drew the blood during the autopsy. He testified as to the manner in which the blood was taken and that he personally labeled the containers and put the samples in a refrigerator. Although he had no personal recollection of the event, he testified that the sample was picked up by someone in the laboratory that same day or the next. The laboratory is a division of the medical examiner's office and located in the same building. Dr. Spitz testified that the alcohol level in the blood is measured by a gas chromatograph and

explained what procedures were used and how the machine worked. He identified the name of the lab technician who performed the test and testified that it was done under the supervision of Dr. Mumford, who reviewed and signed the report. Dr. Mumford is in turn supervised by Dr. Spitz. Dr. Spitz further testified that there would never be a single mistake, that if there was a mistake it would affect all of the samples, and that there were control samples used in the procedure.

In *Gard v Michigan Produce Haulers,* 20 Mich App 402, 407-408; 174 NW2d 73 (1969), *lv den* 383 Mich 777 (1970), this Court, quoting from *Lessenhop v Norton,* 261 Iowa 44; 153 NW2d 107 (1967), set forth rules for admissibility of a blood sample analysis:

" '[T]he party seeking introduction must show (1) that the blood was timely taken (2) from a particular identified body (3) by an authorized licensed physician, medical technologist, or registered nurse designated by a licensed physician, (4) that the instruments used were sterile, (5) that the blood taken was properly preserved or kept, (6) and labeled, and (7) if transported or sent, the method and procedures used therein, (8) the method and procedures used in conducting the test, and (9) that the identity of the person or persons under whose supervision the tests were conducted be established.' "

The factors set forth in *Gard* have been utilized since that time, and the Supreme Court subsequently cited the case as setting forth the foundation requirements for admission of blood test results. *Hubenschmidt v Shears,* 403 Mich 486, 490; 270 NW2d 2 (1978).

This Court has held that compliance with the first six criteria requires the testimony of the individual who took the blood sample. *Rose v Paper Mills Trucking Co,* 47 Mich App 1, 5; 209

NW2d 305 (1973), *Clark v Flint,* 60 Mich App 364, 367; 230 NW2d 435 (1975).

There can be no dispute that in this case the first six criteria were met by the testimony of Dr. Spitz. His testimony established that (1) the blood was timely taken, (2) from the body of Bruce Zyskowski (3) by Dr. Spitz, and (4) that the instruments he used were sterile. Additionally, the blood was (5) properly preserved and (6) labeled. Plaintiff argues that the remaining three criteria were not met.

Dr. Spitz did testify to the "method and procedures used" in moving the blood samples from the autopsy room to the lab within the medical examiner's office, "the method and procedures used in conducting the test", and "the identity of the person or persons under whose supervision the tests were conducted".

Plaintiff's argument is based on the assumption that each of these facts must be established by direct personal observation as to these particular blood samples. We disagree. Each of these three criteria are factual elements whose proof is necessary to lay a foundation for admission of the decedent's blood alcohol content. Their purpose is to ensure that the blood sample and methods used to analyze the sample were reliable. See *Gard, supra; Burke v Angies, Inc,* 143 Mich App 683; 373 NW2d 187 (1985). Proof of these facts can be made based on the same evidentiary rules, by either direct or circumstantial evidence, that exist for the proof of any other facts. The proof required to establish these facts should be no greater than that required to prove any other fact at trial.

Dr. Spitz's testimony was based on his personal knowledge of the routine practice of the medical examiner's office, including the lab, which was

under his auspices. This testimony was relevant and admissible under MRE 406 which provides:

"Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."

Plaintiff relies on *Bauer v Veith,* 374 Mich 1, 3; 130 NW2d 897 (1964), in support of his position that firsthand observation of the sample is required. The Supreme Court stated:

"The annotator of McGowan *[v City of Los Angeles,* 100 Cal App 2d 386: 223 P2d 862; 21 ALR 2d 1206 (1950)] sums up, and we adopt for civil cases as at bar, the consensus of reasoned authority ([21 ALR 2d 1216,] p 1220):

" 'Where it "appears that the various steps in the keeping and transportation" of the specimen, part or object from the time it was taken from the body until the time of analysis "were not traced or shown by the evidence" the identification of the thing analyzed is insufficient and the presumptions that official duty is properly performed and that public records are correct will not supply missing links in the chain.' "

Here, unlike in *Bauer,* Dr. Spitz was able to trace the sample from the time it left his hand, albeit by circumstantial evidence, based on the signature of the lab supervisor and the routine practice of his office.

Recently, this Court held the criteria in *Gard* were met despite the lack of testimony as to who transported the blood sample from the autopsy room to the laboratory. *Burke, supra.* The Court stated:

"We will not add a requirement that we must know exactly which of the three men carried the sample.

What is crucial is that the methods were reliable, that we know who conducted the test, that the blood was timely taken from the particular individual and labeled, that the instruments were sterile and that the method and procedure used in transporting is known. We do not find this to amount to a break in the chain of custody, as the blood was in the custody of one of the three men. 143 Mich App 688.

However, another panel of this Court recently held that the sole testimony of a witness who compiled the test results of a paternity blood test was not sufficient to lay a foundation for admission since he could only testify to the usual procedures used by others in his department in drawing and identifying the blood samples. *Willerick v Hanshalli,* 136 Mich App 484, 489-490; 356 NW2d 36 (1984). While we agree that this testimony did not meet the foundational requirements of *Gard,* we disagree with any implication that testimony of the usual office procedure may not be used to establish the seventh, eighth and ninth requirements.

We conclude that Dr. Spitz's testimony established all nine of the *Gard* criteria and the trial court did not abuse its discretion in ruling that a foundation for the blood alcohol test had been laid. We must keep in mind that the purpose of the *Gard* foundation is to ensure that the sample and the test results are reliable. Dr. Spitz's testimony provided that assurance.

## IV

During trial, in anticipation of the possibility that Dr. Spitz would be asked by defendant Habelmann to testify to the speed of the vehicle based on decedent's injuries and vehicle damage, plaintiff sought a ruling on Dr. Spitz's qualification to give

such testimony. The court sustained plaintiff's objection but subsequently allowed Dr. Spitz to testify to the damage a vehicle would suffer in striking a pedestrian at various speeds. Dr. Spitz testified that at 25 to 30 miles per hour the pedestrian would be thrown onto the hood and perhaps break the windshield. At 45 miles per hour, the body would land on the roof, but the hood would be undamaged. At 60 miles per hour, the body might end up on the trunk of the car or miss the rear of the vehicle entirely as it fell. Dr. Spitz then stated that he had seen pictures of the damaged automobile in this case as well as a copy of the repair bill, and the police report. Previous evidence at trial indicated that the damage to the vehicle corresponded to the 25 to 30 mile per hour speed.

As counsel began to inquire into past testing done by Dr. Spitz on this subject, plaintiff objected and the court excused the jury. During voir dire, Dr. Spitz stated that he had participated in cadaver tests comparing vehicle speed to damage done to pedestrians and to vehicles and that the medical examiner's office was doing such tests in conjunction with Wayne State University. He stated that he had previously testified as to his conclusions on vehicle speed based on such date and that, if allowed to offer his opinion, he would testify that Habelmann's vehicle was moving at between 20 to 30 miles per hour at the time of impact. The trial court refused to allow the testimony, but declined plaintiff's request made the following day to strike the testimony already given.

Plaintiff now claims that under *Jackson v Trogan*, 364 Mich 148, 157; 110 NW2d 612 (1961), this was reversible error because the medical examiner was, in effect, permitted to give an opinion on speed of the vehicle based solely on force of im-

pact. In *Jackson,* a state police officer who investigated an accident between two vehicles was asked to give his opinion on the speed of one of the vehicles. The officer had been a member of the state police for a little over a year, and testified that he had previously investigated "a few accidents". 364 Mich 153. Over objection that the officer had not been qualified as an expert, the officer was allowed to opine, based solely upon a chart which correlated length of skid marks with speed of vehicles, that the vehicle in question had been going 80 miles per hour. The officer admitted he did not understand how the values on the chart had been arrived at, and he did not have the chart with him at trial. The Court, in reversing, cited *Hinderer v Ann Arbor R Co,* 237 Mich 232, 235; 211 NW 734 (1927), wherein the Supreme Court stated: "An estimate of speed based simply on an opinion of the force of impact is not evidence of speed."

Dr. Spitz's testimony is distinguishable from that rejected in *Jackson.* The Court in *Jackson* was concerned with both the lack of experience of the witness and the lack of a factual foundation. In contrast, Dr. Spitz had personally done tests on the damage to pedestrians and vehicles in relation to vehicle speed. Moreover, Dr. Spitz's background and the factual basis for his testimony compares favorably with that of other witnesses whose testimony has been held admissible by this Court. See, *Snyder v New York Central Transport Co,* 4 Mich App 38; 143 NW2d 791 (1966), *Anderson v Lippes,* 18 Mich App 281; 170 NW2d 908 (1969), *Hughes v Allis-Chalmers Corp,* 96 Mich App 175, 179; 292 NW2d 514 (1980), *Johnson v Secretary of State,* 406 Mich 420, 435; 280 NW2d 9 (1979).

Dr. Spitz was well qualified by his knowledge, skill, experience, training and education to offer

the testimony Habelmann sought to elicit. MRE 702. We conclude that the court could have admitted Dr. Spitz's testimony as to vehicle speed. Thus the admission of his testimony, based upon hypothetical vehicle damage that led ineluctably to the same conclusion of vehicle speed, cannot be said to be either an error of law or an abuse of discretion.

In this issue, plaintiff also asserts that it was error for the court to refuse to allow off-duty Detroit Police Officer Thomas Clifford, who happened upon the accident scene shortly after the accident, to offer his opinion as to the speed of the Habelmann vehicle. The officer stated that he was a 15-year veteran of the Detroit Police Department during which time he had occasionally investigated accidents, but never an accident involving fatalities. The court allowed him to testify that, during the course of investigating automobile accidents, he had noticed a correlation between the amount of damage to a vehicle and the speed at which the vehicle was traveling; between how far the clothing of a pedestrian victim is spread out and the speed of the vehicle; and between the speed of the vehicle and the severity of the injury to a pedestrian.

The officer testified that at the scene he estimated the distances of the articles of clothing from the body. He did not measure the distances involved. The court sustained Habelmann's objection to Officer Clifford's testimony as to speed of the vehicle on the basis that his experience in such matters was insufficient. Plaintiff subsequently made an offer of proof that Clifford would have testified that defendant was going 45-50 miles per hour before the impact—double the speed limit.

The trial court did not abuse its discretion in determining that Officer Clifford was not qualified to give an opinion on speed. The proffered testi-

mony more closely fits the facts in *Jackson, supra.*
Officer Clifford had neither the training nor the
experience necessary to estimate the speed of Ha-
blemann's vehicle on the facts available to him.
The distinctions between the experience, training
and knowledge of the officer and that of Dr. Spitz
provide ample justification for the admission of the
testimony of one witness and the exclusion of
testimony of the other.

V

Over plaintiff's objection, the trial court in-
structed the jury on excused violation of the as-
sured clear distance statute due to a sudden emer-
gency. The instruction given conforms with SJI2d
12.01 and 12.02. Plaintiff contends that this was
reversible error because no "emergency" existed
within the meaning of that term, or, even if an
emergency did exist, it was at least in part one of
Habelmann's own making.

Plaintiff relies primarily upon *Vander Laan v
Miedema,* 385 Mich 226; 188 NW2d 564 (1971), in
which the Supreme Court clarified the sudden
emergency doctrine. In *Vander Laan,* the Supreme
Court stated that to come within the purview of
the sudden emergency instruction the circum-
stances of the accident must present a situation
that is unusual or unsuspected.

Habelmann concedes that the circumstances of
the instant accident do not fall within the "unu-
sual" prong of the test for sudden emergency. The
question then is whether the circumstances of the
accident fall within the definition of "unsuspect-
ed".

" 'Unsuspected' on the other hand connotes a poten-
tial peril within the everyday movement of traffic. To

come within the narrow confines of the emergency doctrine as 'unsuspected' it is essential that the potential peril had not been in clear view for any significant length of time, and was totally unexpected. A good example of this can be seen in *McKinney v Anderson, supra,* [373 Mich 414; 129 NW2d 851 (1964)] where defendant rear-ended a plaintiff's car which had stopped while pushing a disabled vehicle on the highway. Coming over the crest of a hill, defendant first saw plaintiff's tail lights when he was 400 feet away. However, defendant did not clearly see the peril of plaintiff's stopping until he was about 100-200 feet away, at which point it was too late to avoid a collision under the circumstances. Furthermore, the failure of the plaintiff to signal that he was stopping, coupled with the surrounding darkness, made the subsequent peril totally unexpected to the defendant." *Vander Laan, supra,* p 232.

Plaintiff argues that the decedent must have been in clear view of Habelmann for a considerable period of time prior to the impact and therefore the potential danger was not "unsuspected", because Habelmann would have had a clear view of objects to the extent illuminated by his headlights. However, our review of the trial testimony reveals that there was ample evidence that the decedent stepped from the right side of the road into the path of the moving vehicle immediately or shortly before impact, and that Habelmann had no opportunity to stop his vehicle before striking decedent, especially in view of the existing condition of the lighting. In fact, there is nothing in the record to indicate that the decedent was walking or standing in the roadway for any substantial period of time prior to the accident.

A party requesting the sudden emergency instruction is entitled to the instruction if there is any evidence presented of an emergency. *Hunter v Szumlanski,* 124 Mich App 521, 527; 335 NW2d 75

(1983), *rev'd on other grounds* 418 Mich 958 (1984); *McKinney v Anderson,* 373 Mich 414, 419; 129 NW2d 851 (1964). Accordingly, we conclude that the instruction was properly given, based on the evidence presented in this case.

## VI

Plaintiff next argues that the trial court erred by denying his request for an instruction on "last clear chance". SJI2d 14.01. The trial court premised its denial upon three grounds. The court expressed serious doubt about the continuing viability of the doctrine in the wake of the Supreme Court's adoption of comparative negligence; the court noted that plaintiff had not pled "last clear chance"; and the court questioned whether there was sufficient evidence that Habelmann had the last clear chance to avoid the accident.

We find it unnecessary to consider the issue of whether the doctrine of last clear chance survived the adoption of comparative negligence, since the evidence did not warrant giving the instruction. We note, however, without expressing approval, that at least one panel of this Court has held that the doctrine survives. *Wilson v Chesapeake & O R Co,* 118 Mich App 123, 128-130; 324 NW2d 552 (1982), *lv den* 417 Mich 1044 (1983).

In order for last clear chance to apply, there must be evidence that plaintiff was either helpless or inattentive prior to the accident and that defendant had notice that plaintiff was helpless or inattentive. *Zeni v Anderson,* 397 Mich 117, 152-153; 243 NW2d 270 (1976). If defendant had either actual or constructive knowledge of plaintiff's helplessness or inattention, then a jury instruction on last clear chance must be given.

In the present case, even it it is assumed that the decedent was either helpless or inattentive, it cannot reasonably be said that Habelmann had either actual or constructive knowledge of the decedent's helplessness or inattention. There was no evidence to suggest that plaintiff's decedent was in the street and there to be seen in time for Habelmann to avoid the accident. *Wilson, supra.* Thus, the trial court did not err in refusing to give the instruction.

## VII

The verdict is reversed on the negligence count as to the Wayne County Board of Road Commissioners only and remanded for a new trial. The jury's verdict of no cause of action in all other respects is affirmed as is the directed verdict in favor of the city.